**The PEOPLE of the State of South Dakota, In the Interest of T.L.J. and D.M.J., Minor Children, and Concerning M.J. and K.J. and the Department of Social Services.**

Nos. 13133, 13134, 13142, 13175.

Supreme Court of South Dakota.

Argued Jan. 7, 1981.

Decided April 1, 1981.

---

Reed C. Richards of Richards & Richards, Deadwood, for appellant mother. (# 13133 & # 13175)

Laurence J. Zastrow of Stephens, Quinn, Carr, Tschetter & Buckmaster, P. C., Belle Fourche, for appellant father. (# 13134 & # 13142)

William E. Anderson, Belle Fourche, for appellees minor children.

Janice Godtland, Asst. Atty. Gen., Pierre, for appellee State of South Dakota; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

HENDERSON, Justice.

## ACTION

M.J. (father) and K.J. (mother), husband and wife, separately appeal from: (1) an order of adjudication entered on February 22, 1980, adjudicating that their two children, T.L.J. and D.M.J., are dependent and neglected; and (2) an order of disposition entered on May 16, 1980, which terminated the father's and the mother's parental rights with regard to T.L.J. and conditionally continued the parental rights of the couple with regard to D.M.J. These appeals were consolidated for the sake of convenience. We affirm.

## PROCEDURAL FACTS

The two children involved in this action are T.L.J., born September 22, 1978, and D.M.J., born September 14, 1977. This case was commenced by an affidavit submitted by social workers who had received information from the University of Colorado Hospital that T.L.J. had been severely burned. The trial court immediately ordered that T.L.J. be placed in temporary custody of the South Dakota Department of Social Services (State). Father and mother

were arraigned before the trial court on October 25, 1979, and November 28, 1979, respectively. Father, mother, and the children were all eventually appointed separate counsel.

An adjudicatory hearing was commenced on November 28, 1979. This hearing was continued on December 20, 1979, and again on January 8, 1980. The trial court ultimately found that D.M.J. and T.L.J. were dependent and neglected children pursuant to SDCL 26–8–6, and consequently a dispositional hearing was held on March 19, 20, and 28, 1980. This hearing resulted in the trial court terminating the parental rights of both father and mother with regard to T.L.J. and continued their parental rights with regard to D.M.J., subject to certain conditions. With ardor, counsel for the children urges this Court to affirm.

## FACTS

During the morning of October 3, 1979, T.L.J. suffered second and third-degree burns over fifty-five to sixty percent of his body which were caused by some type of hot liquid. At the time of the injury, mother, T.L.J., and D.M.J. were the only individuals in the couple's apartment. Father was at work. Mother's explanation of T.L.J.'s injury is as follows: On the day in question, she had been boiling a large amount of water to prepare some tea. While this water was on the stove, mother had removed T.L.J.'s diaper and rolled up his t-shirt in preparation for giving him a bath. Mother then returned to the kitchen and decided to remove the water from the stove to prevent D.M.J. from grabbing at it and possibly burning himself. While removing the pan of boiling water, mother maintains that she tripped, lost her balance, and spilled the water on T.L.J. There is evidence, however, that mother had initially told her neighbors that the older child had poured the hot water on the younger child.

Another version of mother's representation of the facts is the following colloquy between her and the State's attorney which occurred during the adjudicatory hearing of January 8, 1980:

Q [State's Attorney]: I would like to go back to the statement that you made on cross here before we all approached the bench. You started to indicate that the water wasn't hot anymore by the time you reacted to this because it took you a couple of minutes to realize what had happened, or come to, or . . .

A [Mother]: I don't really know how long of a space of time really elapsed. Like I say, I was gone and all of a sudden when I did come to, whatever, I realized that my baby was laying on the floor and he was burned. And my first reaction was to take his t-shirt off and get a blanket and wrap him up.

Q [State's Attorney]: Okay. When you indicate you were gone, you mean you kind of blacked out?

A [Mother]: Yeah, that's kind of how it was.

Q [State's Attorney]: Does that happen very often?

A [Mother]: No.

Q [State's Attorney]: The first time it's ever happened?

A [Mother]: Yeah. I've never had that kind of experience before so it's kind of hard to relate back to.

Q [State's Attorney]: And you don't know how long you were in that state?

A [Mother]: No, but—all I know is that it couldn't have been very long, because it was—the last time I checked the clock it was about 10:00 o'clock, and by the time we got to the hospital the clock said about 20 after 10:00, so I knew it wasn't very long.

Q [State's Attorney]: Okay, so . . . it would be your testimony then that after you spilled this pot of water, and you saw your son down here just immediately after you spilled it, correct?

A [Mother]: Yeah, somewhere in there.

Q [State's Attorney]: That you didn't react to it for some period of time

and you don't know how long you blacked out.

A [Mother]: Yeah, I remember that—I remember opening my eyes and kind of coming to. That was the first thing I remember.

Q [State's Attorney]: And at the time that you spilled the water it was just coming to a boil.

A [Mother]: Yeah, it was bubbling on the surface.

After realizing that T.L.J. was seriously burned, mother sought assistance from neighbors. T.L.J. was then taken to a hospital in Deadwood, South Dakota, and immediately transferred to Rapid City, South Dakota, by ambulance. From Rapid City, T.L.J. was taken to the University Hospital in Denver, Colorado, arriving sometime during the night of October 3, 1979. Mother and father arrived in Denver the following day. Mother remained until October 30, 1979, while father returned home on October 11, 1979.

T.L.J.'s burns were diagnosed as massive second and third-degree type, caused by a hot liquid. The burns were further diagnosed as an immersion type due to their pattern of distribution. T.L.J. was burned below a line which circumvented his body near the chest and upper back area. While at the Denver hospital, it was discovered that T.L.J. was not properly immunized and had a dislocated left shoulder. Approximately seven weeks after the incident, T.L.J. was given a fifty percent chance of survival. It was also determined that, if he survived, T.L.J. had a twenty percent chance of having a permanent functional loss of his left arm and a one hundred percent chance of scarring.

## ISSUES

### I.

Was the trial court clearly erroneous in finding that T.L.J. and D.M.J. were dependent and neglected children? We hold that it was not.

### II.

Did the trial court err by not complying with SDCL 26–8–23.1 and SDCL 26–8–23? We hold that it did not.

### III.

Did the trial court err by terminating father's and mother's parental rights as to T.L.J.? We hold that it did not.

### IV.

Did the trial court err by admitting into evidence certain hospital records and reports whose authors were not available for purposes of cross-examination? We hold that it did not.

### V.

Is SDCL 26–8–36 unconstitutionally vague and overbroad? We hold that it is not.

## DECISION

### I.

■ Mother and father both contend that the State did not prove by a preponderance of the evidence that T.L.J. and D.M.J. were dependent and neglected children. SDCL 26–8–22.10. The parents' burden is to prove that the trial court's findings are clearly erroneous. SDCL 15–6–52(a); *Matter of A.M.*, 292 N.W.2d 103 (S.D.1980). The trial court found that T.L.J. and D.M.J. were neglected and dependent children as defined in SDCL 26–8–6(1), (2), and (3):

In this chapter unless the context otherwise plainly requires "neglected or dependent child" means a child:

(1) Whose parent, guardian, or custodian has abandoned him or has subjected him to mistreatment or abuse;

(2) Who lacks proper parental care through the actions or omissions of the parent, guardian, or custodian;

(3) Whose environment is injurious to his welfare[.]

The trial court, at the conclusion of the adjudicatory hearing, found as a matter of fact:

That according to the expert medical testimony of the treating physician, Dr. Haase, the injuries and the pattern thereof suffered by T.L.J. were, based upon the medical history, consistent with injuries by a hot liquid and were, based upon a reasonable medical certainty, of a type classically described as an immersion type burn, which is generally not accidental in nature.

. . . .

That the injuries and the pattern thereof suffered by T.L.J. are wholly inconsistent with the explanation given by [mother] as to how such injury occurred.

. . . .

T.L.J. was burned through lack of proper parental care or omission of [mother].

■ Mother contends that the State failed to prove that T.L.J.'s burns were intentionally or negligently caused. Specifically, she argues that it was not shown exactly *how* T.L.J. could have been burned in the manner that the State contends, since there was no evidentiary indication of an available container in which T.L.J. could have been sufficiently submerged to cause the burns. We note that the immersion burns demonstrated a straight line across the chest and back. The soles of T.L.J.'s feet were also severely burned. We have reviewed the evidence in conjunction with mother's contention and find it to be without merit.

■ Father argues that the trial court was clearly erroneous in finding that D.M.J., the unburned child, was a neglected or dependent child. As previously mentioned, SDCL 26–8–6(3) defines a neglected or dependent child as one "[w]hose environment is injurious to his welfare." Although no evidence was presented indicating any direct abuse of D.M.J., "[w]here the trial court has determined that neglect or abuse exists in regard to one child, it is within its discretion to determine the likelihood of abuse of other children in the same family." *In Re K.D.E.*, 87 S.D. 501, 506, 210 N.W.2d 907, 910 (1973).

■ It is also contended by father that the trial court erred in determining that T.L.J. was a dependent and neglected child as pertains to him. He argues that he had no reason to know of T.L.J.'s injuries, and that the State did not present any evidence showing that he abused T.L.J. or allowed mother to do so. The fact remains, however, that mother and father are married and living together; had the trial court not found T.L.J. dependent and neglected as to father, thereby allowing T.L.J. to live with father, there would be no purpose served in finding T.L.J. a neglected and dependent child solely as to mother. T.L.J. would still be living with his mother in a potentially injurious type of environment. Such a family atmosphere would frustrate one of the prime purposes of SDCL ch. 26–8, which is to protect the children of the State "from neglect or omission of parental duty[.]" SDCL 26–8–2. *See also Matter of A.I.*, 289 N.W.2d 247 (S.D.1980). We conclude that the trial court's finding that T.L.J. and D.M.J. are dependent and neglected children is not clearly erroneous.

II.

■ Mother contends the trial court erred by not complying with SDCL 26–8–23.1, which reads:

No child shall be held in detention or shelter longer than forty-eight hours, excluding Sundays and court holidays, unless a petition has been filed, or the court so orders following a hearing to determine further detention or release.

The State and the children concede that the trial court did not comply with SDCL 26–8–23.1. They do argue, however, that due to the unique facts of this case, this procedural noncompliance did not constitute prejudicial error, relying upon *People in the Interest of T.C.*, 278 N.W.2d 452 (S.D.1979). If a hearing had been held within forty-eight hours from when the order of temporary custody was filed, both parents would have been unable to attend since they were in Denver for several days after the incident occurred. By enacting SDCL 26–8–23.1, our state legislature undoubtedly envisioned the more

typical situation where the immediate physical custody of a child must be determined. Here, the State's custody of T.L.J. was one of paper only, as he remained in the Denver hospital for many months subsequent to the commencement of these proceedings. Further, it does not appear that mother objected to this error until the final day of the adjudicatory hearing, January 8, 1980. Generally, errors must be brought to the attention of the trial court as soon as they become apparent, thus allowing it the opportunity to take immediate corrective action. *Matter of A.I.*, supra; *State v. Reiman*, 284 N.W.2d 860 (S.D.1979). Mother has not demonstrated how she was prejudiced by the trial court's lack of compliance with SDCL 26–8–23.1.

▋ Mother also contends that the trial court erred by not following the procedures enumerated in SDCL 26–8–23, which reads:

> At any time after the filing of the petition and pending the final disposition of the case, the court may continue the case from time to time and may allow the child to remain in possession of its custodian or in its own home subject to the friendly visitation of a probation officer, or it may order the child to be placed in the custody of a probation officer of the court, or of any other suitable person appointed by the court, or to be kept in some suitable place provided by the city or county authorities. Such continuation shall extend no longer than three months.

This statute, mother argues, requires that the adjudicatory phase of a dependency and neglect proceeding be completed within three months from the time it is commenced. The adjudication decree in this case was filed approximately four months after the petition. The three-month continuation provision of SDCL 26–8–23, however, is only applicable to the dispositional phase in cases of this kind. *In Re K.D.E.*, 87 S.D. 501, 210 N.W.2d 907 (1973); *In Re P.L.H.*, 86 S.D. 564, 199 N.W.2d 587 (1972). We hold, therefore, that the trial court did not violate SDCL 26–8–23.

### III.

▋ Father and mother next contend that the trial court erred in terminating their parental rights with regard to T.L.J. Citing as authority *Matter of B.E.*, 287 N.W.2d 91 (S.D.1979), they contend that the facts must indicate by clear and convincing evidence that potential harm to T.L.J. would result if the parent-child relationship was allowed to continue. In *B.E.*, we used the phrase "clear preponderance of the evidence" in reference to the quantum threshold necessary to terminate parental rights. We do not consider *B.E.* to stand for the proposition which father and mother are now contending. Furthermore, SDCL 26–8–36 provides, in pertinent part, that "[t]he court may enter a decree terminating all parental rights of one or both parents in the child when it finds that the *best interest and welfare of the child* so require." (Emphasis supplied.) Parental rights, then, are only to be terminated when doing so would be in the best interests of the child. *Matter of B.A.M.*, 290 N.W.2d 498 (S.D.1980). This Court has qualified and expounded upon this standard on several occasions: A trial court must not terminate a party's parental rights when a less restrictive alternative is available. SDCL 26–8–35; *Matter of B.E.*, supra. Where efforts to aid or counsel parents by the use of social services proves unavailing, termination of parental rights is justified. *Matter of A.I.*, supra; *Matter of R.Z.F.*, 284 N.W.2d 879 (S.D.1979); *Matter of C.E. and D.E.*, 283 N.W.2d 554 (S.D. 1979). Nevertheless, compelling circumstances may require a termination without delay. *Matter of B.E.*, supra.

Pursuant to this action, mother was examined by a psychologist. She was diagnosed as having an hysterical dependent personality with masochistic and martyristic features. Specifically, the psychologist testified that mother had a tendency to let things build up within her and then have a hysterical dissociative reaction. According to the psychologist, this caused her to "blank out, blot out, or split off." He characterized mother as having a hysterical personality disorder and recommended psychotherapy. The psychologist also testified

that, without support, mother poses a danger to her children. Also, it is to be noted that father is generally supportive of mother in her explanation that T.L.J.'s injuries were accidental.

■ In the alternative, father and mother contend that the trial court erred in terminating their parental rights with regard to T.L.J. due to the availability of a lesser restrictive alternative. SDCL 26–8–35; *Matter of B.E.*, supra. Both parents maintain that they were denied the opportunity to avail themselves of the social service recommendations initially made by the trial court for the purpose of creating a more suitable parental atmosphere.[1] The trial court subsequently veered from this position. Upon a review of the facts of this case, and realizing the severity of T.L.J.'s injuries and his immediate need for a suitable familial environment, we hold that the compelling circumstances herein warranted a termination of father's and mother's parental rights as to T.L.J. *Matter of B.E.*, supra.

## IV.

Father contends that the trial court erred by admitting into evidence three written reports/evaluations during the adjudicatory phase of the proceedings.[2] Father argues that since the authors of these documents were unavailable for cross-examination, the reports should not have been admitted under SDCL 26–8–32.5, which reads:

1. These recommendations included mental health counseling, weekly social service counseling, and parent-aide services.

2. One document consists of approximately 117 pages of progress reports and physical evaluations of T.L.J. by the Denver hospital staff and social workers. Another document is a four-page psychological evaluation of T.L.J. recommending that he not be returned to his natural parents until a psychiatric evaluation of both parents be made. The third document consists of fourteen pages of progress notes and a discharge plan for T.L.J. prepared by various medical personnel at the Denver hospital.

3. SDCL 19–16–10 states:
    A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near

When directed by the court, the probation department or other agency designated by the court shall make a social study and written report to the court.

In adjudicatory hearings, written reports and other material relating to the child's mental, physical and social history may be received and considered by the court along with other evidence provided that the court, if so requested by the child, his parent or guardian, or other interested party, shall require that the person who wrote the report or prepared the material appear as a witness and be subject to both direct and cross-examination. In the absence of such request, the court may order the person who prepared the report or other material to appear if it finds that the interest of the child, his parent or guardian, or other party to the proceedings so requires.

■ Here, however, the trial court did not direct any agency or department to submit the reports in question; they were obtained and submitted entirely through the impetus of the State. The documents do appear to be admissible under SDCL 19–16–10.[3] We hold that the trial court did not err by receiving these documents into evidence.

## V.

■ Finally, mother contends that SDCL 26–8–36 is unconstitutionally vague and overbroad. The pertinent part of this statute provides:

the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, is not excluded by § 19–16–4, even though the declarant is available as a witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this section includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

The court may enter a decree terminating all parental rights of one or both parents in the child when it finds that the best interests and welfare of the child so require.

It is mother's argument that this statute does not properly notify a parent as to what type of conduct would warrant the termination of parental rights. SDCL 26–8–36, however, is not the sole statutory guideline in this state regarding parental conduct. SDCL 26–8–6 provides:

In this chapter unless the context otherwise plainly requires "neglected or dependent child" means a child:

(1) Whose parent, guardian, or custodian has abandoned him or has subjected him to mistreatment or abuse;

(2) Who lacks proper parental care through the actions or omissions of the parent, guardian, or custodian;

(3) Whose environment is injurious to his welfare;

(4) Whose parent, guardian, or custodian fails or refuses to provide proper or necessary subsistence, education, medical care or any other care necessary for his health, guidance, or well-being; or

(5) Who is homeless, without proper care, or not domiciled with his parent, guardian, or custodian through no fault of his parent, guardian or custodian.

As this court stated in *Matter of V.D.D.*, 278 N.W.2d 194, 196 (S.D.1979): "SDCL 26–8–6 does provide adequate standards from which an average intelligent person can regulate his conduct. This statute conveys a sufficiently definite warning as to proscribed parental conduct to such an extent that the statute is not unconstitutionally vague." Enactments of the legislature should be upheld unless they are clearly and unmistakably unconstitutional. *Matter of D.T.*, 89 S.D. 590, 237 N.W.2d 166 (1975). In light of the standards expressed in SDCL 26–8–6 and our interpretation thereof in *V.D.D.*, we hold that SDCL 26–8–36 is not unconstitutionally vague or overbroad.

Accordingly, the orders of the trial court are affirmed.

All the Justices concur.