**In the Matter of L. M. T., a Neglected and Dependent Child, and Concerning P. F. T. and S. T.**

**No. 13187.**

Supreme Court of South Dakota.

Argued March 25, 1981.

Decided May 6, 1981.

Janice Godtland, Asst. Atty. Gen., Pierre, for respondent State of South Dakota; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

John D. Wagner, East River Legal Services, Brookings, for appellants P. F. T. and S. T.

DUNN, Justice.

This is an appeal from a decree of disposition entered in a dependency and neglect action terminating the parental rights of S.T. (the mother) and P.F.T. (the father) in L.M.T., one of their minor children. We affirm.

This case originated from a tragic event that occurred on March 18, 1979, when the father picked up L.M.T., who was then two months old, and threw her onto the floor. This act ostensibly occurred because L.M.T. was crying and because the father was under a great deal of mental pressure. L.M.T. was subsequently taken to the Medical Center in Watertown, South Dakota, and later transferred to the intensive care unit at Sioux Valley Hospital (Sioux Valley) in Sioux Falls, South Dakota.

The child was comatose when she was admitted to Sioux Valley and suffering from extensive fractures and intercranial bleeding. A shunt was surgically placed in her head to divert large amounts of fluid from the brain to the abdominal cavity, thereby reducing pressure on her brain. She required further surgery ten days later to repair the lining of her brain. A third operation was needed to repair the shunt.

The father was criminally charged with child abuse to which he pleaded guilty and was sentenced to one year in the Codington County Detention Center. After serving approximately five months of the sentence, he was released on parole.

On April 16, 1979, a dependency and neglect petition was filed against the mother and father. On April 20, 1979, L.M.T.'s parents admitted the allegations in the petition. The child was then placed in the continued custody of the State Department of Social Services, which had already put her in a foster home.

When L.M.T. first arrived at the foster home, she was immobile. L.M.T. needed extensive therapy with her extremities as she could barely move her arms and legs. This therapy was performed by her foster parents. She is hypotonic (meaning her muscle tone was higher than that of a normal child), which requires that her muscles be kept limber. If the muscles are not kept limber they will draw up and no longer be of any use. As a further result of her injuries, L.M.T. also has a misshapen head, with a lump about one-fourth the size of her head protruding from the left side thereof. She may carry this hideous deformity with her for the rest of her life. Eventually a steel plate will be placed in her head. Until then, she must wear a helmet whenever she is in a place where she might be injured. When she is awake, her right eye is open very wide, while the left is only slightly open.

Aside from these obvious anatomical deformities, L.M.T. will need extensive developmental training and guidance. She lags far behind her peers. At the age of seven months she was developmentally at the level of a three- or four-month-old child. At the age of eleven months she could not raise her head beyond a five-degree angle while laying on her stomach, nor could she roll over and crawl. At thirteen months she could still only lift her head somewhat and could not rise up on her elbows. She could vocalize vowel sounds, but not sounds that required her to have her mouth open.

The foster mother devotes eight hours every day to L.M.T.'s care. As an example of the care required, L.M.T. needs therapy to eat and drink for she has difficulty in drawing her mouth up. The foster mother also exercises her and rubs her body with lotion to stimulate the nerves. L.M.T. is given a bath and a rubdown as further therapy and included in these eight hours of exclusive care are the normal things like fixing her bottle, changing her, plus the extra time required just to hold her and move her around due to her immobility. The foster parents also had to learn how to operate L.M.T.'s shunt. When pressure builds up in her head they have to push in the shunt to clean the line of fluid.

Because the child needed extensive professional help, the foster parents have made forty-five trips to Sioux Falls in eleven months. Twenty of those trips were to visit her in the hospital, four were to take her and bring her home, and the remainder were trips to the Crippled Children's Hospital to see an opthamologist, to the School for the Deaf, and to a neurosurgeon and a pediatrician.

We now turn from L.M.T.'s unfortunate situation to that of her natural parents. Both natural parents were examined by Dr. Kennelly, a psychologist. Dr. Kennelly found no indication of any major mental disorders; however, he did have some reservations about their level of maturity. He stated neither parent was able to accept full responsibility for what happened to their daughter, nor did the father expect to pay for any of the child's care. Rather, he expected governmental agencies to assume this responsibility. The father also would not talk about the child's injury and referred to the incident as a fall. Dr. Kennelly stated if the father would talk about such a painful event it would show a concern for the child above himself. The fact that the mother was currently pregnant was also considered to be very significant by Dr. Kennelly, as it would give rise to the same financial and emotional circumstances which precipitated the first instance of abuse. Dr. Kennelly further found:

> In summary the psychiatric interview in this situation reveals no serious mental disorders. Both Mr. and Mrs. T. are in the average intellectual range. I'm concerned about the idea of maturity and the degree of realistic appraisal of change. I am most concerned about their ability to accept responsibility for what happened to L.[M.T.] one year ago.

A dispositional hearing was held on December 3, 1979. All the parties stipulated that L.M.T. was a dependent and neglected child. At the end of this hearing the court chose to continue the matter until March when the father might be released from his incarceration. Pursuant to that continuance, a second hearing was held on March 21, 1980, resulting in the order terminating the parental rights of P.F.T. and S.T.

Appellants raise the following six issues on appeal:

(1) The evidence is insufficient to support several of the findings of fact entered by the Court;

(2) Due process of law requires that parents may not be deprived of their parental rights on any lesser standard than "clear and convincing evidence";

(3) The "best interests and welfare of the child" standard contained in S.D.C.L. § 26–8–36 is unconstitutionally vague and void;

(4) Without a finding of a threat of future abuse, the State has no strong and compelling interest in terminating parental rights;

(5) Failure of the trial court to find that less drastic alternatives were considered violated their procedural due process; and

(6) The "best interests and welfare of the child" standard is in need of a limiting construction.

■ We do not find that there is insufficient evidence to support the trial court's findings, nor are they clearly erroneous. SDCL 15–6–52(a); *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). Therefore, we refuse to upset those findings.

A complete listing of each finding challenged by appellants and individual recitations of the supporting evidence thereof would serve no useful purpose.[1] A brief recitation of a modicum of the evidence supporting the trial court's findings will suffice.

The record indicates that the foster parents' care has been quite substantial. They have made herculean efforts in caring for the unfortunate infant. They have injected a stable home, where L.M.T. receives almost constant therapy in an attempt to return her to some level of normality, into her otherwise unfortunate plight. For this Court to state that the constant and attentive care of these foster parents has not precipitated much of L.M.T.'s gains would be a misstatement of the facts.

The record also indicates that the natural parents are immature and the father is volatile and impulsive. At least two witnesses testified to the appellants' immaturity, with Dr. Kennelly making that assessment in his analysis of the situation. Further, the pivotal incident where L.M.T.'s injuries occurred, in and of itself, lends sufficient support to sustain these findings; especially as they relate to the father's volatility and impulsiveness.

As for the other challenged findings, the record indicates that the father has difficulty explaining this event as anything other than a fall. Dr. Kennelly testified that this indicates an inability or unwillingness to accept responsibility for this event. As stated earlier, the father intends to provide no financial support for L.M.T.'s treatment and expects it to be paid for by government agencies. The record also supports the finding that there is at least a fifty percent chance of recidivism. Finally, the mother openly admitted that they are not currently capable of caring for L.M.T.

In summation, we are not convinced that the findings of the trial court are clearly erroneous or unsupported by the evidence and therefore refuse to interfere with those findings.

The other issues raised by appellants pose constitutional challenges to various aspects of the proceedings involved in a termination of parental rights. We shall therefore address them co-jointly.

■ This court has long recognized that parents have a fundamental right to their children. *Matter of K.D.E.*, 87 S.D. 501, 210 N.W.2d 907 (1973). This does not, however, give them an absolute and unconditional right to their offspring. *K.D.E.*, supra. "Parentage is a very important profession; but no [prior] test of fitness for it [was] ever imposed in the interest of children."[2] We must therefore deal in terms of past events and the reality of tragic results that sometimes arise therefrom.

■ The State, as parens patriae, must take a strong interest in the welfare of every child within its parameters. It must be remembered that children are not merely chattels; they have rights as sacred and secure in law as those of their parents. The mere fact of parentage does not give one a license to abuse children either by omission

---

1. A brief summary of the challenged findings are as follows: (1) that L.M.T.'s developmental gains have been the direct result of the foster home's care; (2) P.F.T. is highly volatile and impulsive, and P.F.T. and S.T. are immature; (3) P.F.T. refuses to accept responsibility for what happened; (4) the recidivism rate is fifty to seventy percent; and (5) that the parents recognize their inability to cope with the responsibility of caring for L.M.T.

2. G. B. Shaw, "Everybody's Political What's What" at 74 (1944).

or commission. *In re Kidder*, 61 Mich.App. 451, 233 N.W.2d 495 (1975).

■ Appellants argue that the standard of proof required for termination of parental rights should be clear and convincing, not a preponderance of the evidence. It does not appear that this issue was raised at the trial level; thus, it is not properly pursued here. *In re S.J.Z.*, 252 N.W.2d 224 (S.D.1977). Assuming it is properly before us, we would find appellants' argument unpersuasive. Rather, we find compelling the logic of *Tucker v. Marion Cty. Dept. of Public Welfare*, 408 N.E.2d 814 (Ind.App. 1980). In *Tucker*, it is recognized that the purpose behind the varying standards of proof is to allocate the risk of erroneous judicial action. In concluding that the preponderance of the evidence standard passes constitutional muster, in terminating parental rights, that court stated:

> The "clear and convincing" evidence test results in a smaller risk that parental rights will be erroneously curtailed or even terminated, but a greater risk that the child, as a result of factual error, will be forced to remain in or return to a hostile, if not dangerous, family and home environment.... We here decide that if factual error is to be made, that it [error] be in the best interests of the child as perceived by the trial court.

*Tucker*, supra, at 820 (citations omitted). Accord, *T.L.J. and D.M.J.*, 303 N.W.2d 800 (S.D.1981).

Appellants next challenge SDCL 26–8–36 as being vague and overbroad. In light of our recent holding in *T.L.J.*, we see no merit in this contention, nor any need to reiterate our reasoning herein.

■ Appellants also challenge this termination as being violative of due process, in that there was no express finding of a potential harm to L.M.T. In support of their contention they cite *Roe v. Conn.*, 417 F.Supp. 769 (N.D. Alabama, 1976). Therein it is stated that: "The State's interest . . . would become 'compelling' enough to sever entirely the parent-child relationship only when the child is subjected to real physical

or emotional harm and less drastic measures would be unavailing." *Roe*, supra, at 779 (footnotes omitted). Without again belaboring L.M.T.'s extensive injuries, we find that she has suffered real physical harm. This state has a compelling interest in preventing L.M.T. from suffering further harm.

Appellants also argue that the termination of their parental rights was not the least restrictive alternative. We must remember that in cases such as this the primary concern is the welfare of the child. Here, L.M.T.'s natural parents admit they are currently incapable of providing her with the care needed. L.M.T.'s rights must be paramount to all others herein. She must be given every opportunity to return to some degree of normality. The trial court concluded, and we agree, that L.M.T. could not be adequately cared for by her natural parents. We refuse to disturb that conclusion.

■ Finally, it is urged that even if the father's parental rights were properly terminated, those of the mother should not be terminated. This identical argument was advanced in *T.L.J.*, supra, wherein we stated:

> The fact remains, however, that mother and father are married and living together; had the trial court not found T.L.J. dependent and neglected as to father, thereby allowing T.L.J. to live with father, there would be no purpose served in finding T.L.J. a neglected and dependent child solely as to mother. T.L.J. would still be living with his mother in a potentially injurious type of environment. Such a family atmosphere would frustrate one of the prime purposes of SDCL ch. 26–8, that is, "to protect the children of the State from neglect or omission of parental duty[.]" SDCL 26–8–2. *See also Matter of A.I.*, 289 N.W.2d 247 (S.D. 1980). We conclude that the trial court's finding that T.L.J. and D.M.J. are dependent and neglected children is not clearly erroneous.

Id., at 7.

The same result is dictated here. We therefore conclude that both natural par-

ents' parental rights were properly terminated. All other issues not herein discussed are deemed to be without merit.

Accordingly, the decree of disposition is affirmed.

All the Justices concur.