637 P.2d 740

## In the Matter of the APPEAL IN GILA COUNTY JUVENILE ACTION NO. J-3824.

### No. 15429-PR.

Supreme Court of Arizona, En Banc.

Nov. 24, 1981.

Peter Cahill and Deborah Ham, Cahill & Ham, Globe, for appellant mother.

Sevrin Huselid, Globe, for minor child.

Robert K. Corbin, Atty. Gen. by Thomas A. Jacobs, Phoenix, for appellee Arizona Dept. of Economic Sec.

HAYS, Justice.

This is an appeal from an order of the Gila County court terminating the relationship between a two-year-old child and her mother and father. The Court of Appeals affirmed in a memorandum decision. This Court granted review. See A.R.S. § 8–236(A), as amended Laws 1980; Rule 28, Rules of Procedure for the Juvenile Court, 17A A.R.S. The decision of the Court of Appeals is vacated and the order of the trial court as to appellant mother is reversed.

Appellee, the Arizona Department of Economic Security, sought to terminate the relationship between appellant mother and her daughter on the ground that appellant was unable to discharge her parental responsibilities because of mental deficiencies. A.R.S. § 8–533(B)(3). When termination is sought for this reason, under A.R.S. § 8–535(D), "the court shall appoint a guardian ad litem for the alleged incompetent parent." However, no guardian was appointed for appellant.

Termination proceedings must be conducted in strict compliance with the statutes involved. In *Webb v. Charles*, 125 Ariz. 558, 611 P.2d 562 (App.1980), the court said:

"We can appreciate the court's concern for the welfare of the minor child and its desire to act in his best interest. However, when the state deprives a parent of the fundamental right to raise his child, the proceedings must be conducted in strict compliance with the statutes involved and under the aegis of the Fourteenth Amendment."

125 Ariz. at 561, 611 P.2d 562. *See also Anguis v. Superior Court*, 6 Ariz.App. 68, 429 P.2d 702 (1967). The court below, in failing to comply with the legislative mandate, deprived appellant of the assistance of a person capable of acting with full mental capacity in her behalf. Moreover, by Rule 22, Rules of Procedure for the Juvenile Court, 17A A.R.S., it is the responsibility of the court to ensure that the "asserted incompetent" receives the full panoply of legal rights by supervising the guardian ad litem. Rule 22 provides:

"The court shall require such guardian ad litem to faithfully discharge his duties and, upon his failure to do so, shall discharge him and appoint another."

The duty of the court to protect the interests of the asserted incompetent appellant manifestly could not be exercised since no guardian was appointed. This alone was a sufficient basis for reversal.

■ Appellee cites to A.R.S. § 8–531(5), which defines "guardian ad litem" as "a person appointed by the court to protect the interest of * * * an incompetent * * *" and argues any error in failing to appoint a guardian ad litem was harmless because appellant was represented by an attorney from the Pinal and Gila Counties Legal Aid Society. Appellant counters this argument by alleging she did not receive effective assistance of counsel in the Superior Court.

From the facts which have developed on appeal, it appears that appellant was originally represented by an attorney, Peter Cahill, of the Pinal and Gila Counties Legal Aid Society. Cahill represented her until May 21, 1980, withdrawing as her counsel when he entered private practice. Thereafter, from July 4, 1980 until November 18, 1980, Fernando Almendarez, also an attorney for the Pinal and Gila Counties Legal Aid Society, was responsible for her case. Between July 4, 1980 and the trial of this matter on October 22, 1980, appellant talked with Almendarez on the telephone several times regarding visitation with her child, but he did not otherwise discuss her case with her. Although appellant tried to get an appointment with him, she never met Almendarez until the day of the trial. Finally, an appointment was arranged for 9:00 a.m. in the office of the Pinal and Gila Counties Legal Aid Society on October 22, the day of the trial, but Almendarez did not arrive at the office until about 10:00 a.m., and he then told her to go to the courthouse where he would meet her. She next met Almendarez while walking into the courthouse, but even then there was no discussion of her case. Almendarez went to a conference with the judge, opposing counsel and petitioner's social worker, to which appellant was not invited. The trial began after this meeting. Appellant wanted to testify about her ability to care for her child and she wanted to contradict testimony of certain witnesses, but Almendarez told her he would not have her testify, even though she was told by the court that she could testify.

When Cahill was her attorney, appellant had told him she knew James A. MacDonald, a psychologist, and disliked him. Cahill therefore entered into an agreement with petitioner, the Department of Economic Security, that appellant would be examined by a Dr. Thomas O'Brien. Nevertheless, after Almendarez became her attorney, arrangements were made for appellant to be seen by Dr. MacDonald. When appellant called Almendarez to ask him if she had to be examined, he told her she did. "And the only reason given that petitioner, the Arizona Department of Economic Security, had ordered it."

As the trial progressed, the principal witness against appellant turned out to be Dr. MacDonald. He testified:

"Q. Does Miss Evans suffer from a mental illness or mental deficiency?

A. Both, actually. The mental deficiency is the borderline retardation and mental illness would be the borderline personality development.

. . . .

Q. In your opinion, Doctor, is Miss Evans able to parent a two year old child at this time?

A. No."

No cross-examination whatsoever was made by Almendarez of Dr. MacDonald. Nor was any objection made to the admission into evidence of his written report, Exhibit 1. Moreover, no witness whatsoever was called in appellant's behalf, although potential witnesses existed, including a Dr. Theresa Flores, a psychologist who had testified on her behalf in a previous proceeding in this fashion.

"Q. Have you formed any opinion as to whether Nelda is capable of providing adequate care for her child?

A. Yes. I have formed a professional opinion that Nelda is capable of providing care for her child with some supervision to teach her some basic skills which she has apparently not learned before."

In addition, A.R.S. § 8–538(A) provides: "Every order of the court terminating the parent-child relationship . . . shall be in writing and shall recite the findings upon which such order is based, . . . ."

In this case, the court's findings of fact stated only that appellant was the natural mother of the child born to her on September 15, 1978, that she had personal notice of the proceeding for the termination of the parent-child relationship, that no person who claimed to be the natural father of the child made an appearance in the action, and that no person claiming to be the natural father of the child has maintained a parental relationship with the child. No finding of fact whatsoever was made concerning the statutory grounds for severance of the relationship, namely, that she had neglected the child and was unable to discharge her parental responsibilities because of mental deficiencies which would continue for such a time as to require the severance

of the parent-child relationship. Appellant's counsel, Almendarez, failed to object to the findings of fact and conclusions of law and the order predicated thereon terminating the relationship between appellant and her child.

Almendarez did file a notice of appeal, but the supporting memorandum required by Rule 25(b), Rules of Procedure for the Juvenile Court, 17A A.R.S., was only one-half page long. Subsequently, appellant discharged Almendarez, retaining her former counsel, Peter Cahill, who filed a supplemental memorandum on her behalf raising the issues herein considered.

The facts developed by appellant's present counsel compel us to conclude that appellant received ineffectual assistance of counsel in the Superior Court.

Appellant also challenges the constitutionality of A.R.S. § 8–537(B), which sets the standard of proof in termination proceedings as a preponderance of evidence. Appellant argues that because individual rights are involved in termination cases, the standard of proof must be "clear and convincing evidence" in order to satisfy the requirements of substantive due process.

■ In deciding what due process requires in the context of a particular proceeding, we must evaluate the private interests at stake, the state's interests, and the risk that the procedures used will lead to erroneous decisions. *Lassiter v. Department of Social Services of Durham County,* —— U.S. ——, ——, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981). Such an analysis was employed by the Court of Appeals in *Hernandez v. State ex rel. Arizona Department of Economic Security,* 23 Ariz.App. 32, 530 P.2d 389 (1975), where the court identified the competing interests as follows:

"As usual, we are faced with the judicial task of balancing competing interests. We are not only concerned with the rights of the natural parents but also the rights of the minor child, which include the right to good physical care, adequate food, shelter and clothing, the right to emotional security, the right to be free

from injury and neglect and the right to be with his natural parents and siblings.

"If one were to focus only on the rights of the natural parents it would perhaps be arguable that a burden of proof higher than a preponderance of the evidence is necessary to achieve the sometimes elusive standard of 'fundamental fairness'. After all, for some parents the loss of a child through this legal process can be as serious as imprisonment in a criminal case. However, we are not dealing solely with the rights of the parents, and the problem must be analyzed with all interests in mind."

*Id.* at 35, 530 P.2d at 392.

Recognizing that " 'a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication,' " *Id.* at 35, 530 P.2d at 392 (quoting from *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)), the court concluded:

"In a termination proceeding an error in factual determination can result in the termination of the parental relationship when such termination is not justified. On the other hand it can result in the failure to terminate when the relationship should be ended. The standard of proof is going to affect the relative frequency of those two erroneous outcomes. The standard of 'a preponderance of the evidence' rather than 'clear and convincing evidence' would result in a greater risk than [sic] parental rights would be erroneously severed, but a smaller risk than [sic] a child, as a result of a factual error, would be forced to return to a hostile, if not dangerous, family situation or spend his childhood in a series of temporary foster homes. Comparing the social disutility of these two erroneous outcomes, we do not believe that one can make a fundamental value determination that the erroneous severance of parental rights, vis-a-vis the erroneous failure to

sever, constitutionally requires a higher burden of proof."

23 Ariz.App. at 36, 530 P.2d at 393.

The approach utilized in *Hernandez* has been attacked in a recent law review article on the ground that "the court raised the individual rights of both the parents and children above the interest in the family relationship." *Involuntary Termination of Parental Rights: The Need For Clear and Convincing Evidence*, 29 American University Law Review 771, 792 (1980). The common interest of parents and child in the preservation of the family unit, it is argued, deserves protection from undue state interference which would best be protected by the use of the "clear and convincing evidence" standard. *Id.* at 793; *see also The Right to Family Integrity: A Substantive Due Process Approach to State Removal and Termination Proceedings*, 68 Georgetown Law Journal 213 (1979).

There can be no doubt that the right to custody and control of one's children is a fundamental one. *Appeal In Pima County, Juvenile Action No. J–46735 v. Howard*, 112 Ariz. 170, 540 P.2d 642 (1975). Further, the state has a preeminent interest in the status of the parent-child relationship. *Appeal In Maricopa County, Juvenile Action No. JS–734*, 25 Ariz.App. 333, 543 P.2d 454 (1975). In its capacity as *parens patriae*, however, the state may intrude into the parent-child relationship due to the *state's interest* in the future well-being of minor children residing in this state. *Appeal In Maricopa County, Juvenile Action, Nos. A–23498 and JS–2201*, 120 Ariz. 82, 84, 584 P.2d 63, 65 (1978). This interest not only concerns the child's physical and emotional well-being, but also reflects an interest in fostering good citizens. When these interests are at stake, the state's intrusion into the family relationship is justified and is well within the power of the state to implement. *Appeal in Maricopa County Juvenile Action No. JS–734, supra; see Stanley v. Illinois*, 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972).

Before any termination proceedings are initiated, the parent-child or family re-

lationship is a fundamental interest which the state shares an interest in preserving. When termination proceedings are initiated, however, these interests realign. When one or more of the grounds for termination is alleged to exist, the interest in preserving the family relationship is most strongly held by the parent. When it appears that grounds for termination are present, the interest of the child is opposed to the interest of the parents, and the state's interest in preserving the family unit is outweighed by its interest in the well-being of the child. When these interests are balanced against each other, the requirements of due process are best met by the use of the preponderance of evidence standard of proof.

In reaching this conclusion, we specifically reject the contention that the protection of the interests of the family relationship should require a more demanding standard of proof. The asserted purpose of requiring a higher standard of proof is to assure that any error in the fact-finding process will be in favor of the family relationship. However, we believe that such an approach conveniently ignores or overlooks realities of our society in which child abuse and neglect are all too common. In our view, the parents' due-process rights and the interests of the family are worthy of protection but not to the extent that the state and courts must wait until presented with an obviously maltreated child before being able to terminate the parental rights.

Appellant refers us to *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), which, it is contended, lends support to the argument that the parents' due-process rights must be protected by a "clear and convincing" evidence standard. In *Addington*, the United States Supreme Court held that the standard of proof to be used in involuntary, indefinite civil commitments must be greater than a preponderance of the evidence, but need not be as great as the reasonable doubt standard. We do not agree that *Addington* lends support to appellant's position.

We observe that many other state courts have also rejected attacks on the use of the preponderance of evidence standard in light of *Addington*. See *Tucker v. Marion County Department of Public Welfare*, Ind.App., 408 N.E.2d 814 (1980); *Custody Of A Minor*, —— Mass. ——, 393 N.E.2d 379 (1979); *In the Matter of Five Minor Children*, 407 A.2d 198 (Del.1979), *probable jurisdiction noted, sub nom. Doe v. Delaware*, 445 U.S. 942, 100 S.Ct. 1336, 63 L.Ed.2d 775 (1980), *dismissed for want of properly presented federal question*, 450 U.S. 382, 101 S.Ct. 1495, 67 L.Ed.2d 312 (1981); *see also Matter of L.M.T.*, 305 N.W.2d 399 (S.D.1981); *Matter of John AA*, 75 A.D.2d 910, 427 N.Y.S.2d 319 (1980), *cert. granted, sub nom. Santosky v. Kramer*, 450 U.S. 993, 101 S.Ct. 1694, 68 L.Ed.2d 192 (1981); *In re Lester*, 417 A.2d 877 (R.I.1980); *Custody Of A Minor*, —— Mass. ——, 389 N.E.2d 68 (1979). For cases decided before *Addington* which have upheld the constitutionality of the preponderance standard, see *Matter of B.E.*, 287 N.W.2d 91, 95 (S.D.1979); *Matter of S.*, 26 Or.App. 219, 552 P.2d 578 (1976).

These cases emphasize that the rights of parents in maintaining the family unit are secondary in importance when they are in direct conflict with the best interests of the children. The courts have also found *Addington* inapplicable to termination proceedings. The position of these courts is best expressed by the Supreme Judicial Court of Massachusetts:

"It is our view that [*Addington* does not control] in care and protection proceedings. Involuntary commitments entail deprivations of liberty of a character different from those involved here. Moreover, the compelling interests at stake are distinguishable. In ... *Addington*, a single individual's interests were pitted directly against those of the State. In custody proceedings, there exists a third interest—that of the child, whose welfare might significantly be jeopardized by requiring a more onerous burden of proof. We do not think that the Constitution mandates burdening the State with a standard of proof that may

render meaningless its efforts to curtail child neglect and maltreatment."

*Custody of a Minor,* 393 N.E.2d at 385.

█ We hold that the preponderance of the evidence standard of proof contained in A.R.S. § 8–537(B) is not violative of due process. However, in view of our finding that appellant was denied her right to a guardian ad litem and received ineffectual assistance of counsel, the judgment entered herein is reversed and the matter is remanded for a new trial.

HOLOHAN, V. C. J., and CAMERON and GORDON, JJ., concur.

STRUCKMEYER, Chief Justice, dissenting.

While I believe the decision of the Court of Appeals should be vacated and this matter returned to the trial court for further consideration, I disagree with the majority's holding as to the preponderance of the evidence standard of proof.

In *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the Supreme Court of the United States decided that a preponderance standard is constitutionally impermissible in involuntary psychiatric commitment proceedings.

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact-finding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.

\* \* \* \* \* \*

\* \* \* [E]ven if the particular standard-of-proof catchwords do not always make a great difference in a particular case, adopting a 'standard of proof is more than an empty semantic exercise.' In cases involving individual rights, whether criminal or civil, '[t]he standard of proof [at a minimum] reflects the value society places on individual liberty.' " Id. at 423, 425, 99 S.Ct. at 1809, 60 L.Ed.2d at 329, 330 (citations omitted).

I certainly think that if a preponderance standard is constitutionally impermissible in involuntary psychiatric commitment proceedings, it is equally or even more impermissible where there is sought, as here, to terminate the relationship of parent and child. The standard of proof, as *Addington* indicates, points up the relative importance attached to the ultimate decision. At stake in termination proceedings is the family's fundamental and constitutionally protected right to be free from undue state intervention. The United States Supreme Court has long recognized that the rights to conceive and to rear one's children are "essential," *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923), "basic civil rights of man," *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942), and indeed "[r]ights far more precious \* \* \* than property rights," *May v. Anderson,* 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221, 1226 (1953). The right to family integrity has been accorded protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska,* 262 U.S. at 399, 43 S.Ct. at 626, 67 L.Ed. 1045, the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma,* 316 U.S. at 541, 62 S.Ct. at 1113, 86 L.Ed. 1660, and in the Ninth Amendment, *Griswold v. Connecticut,* 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510, 522 (1965) (Goldberg, J., concurring).

It is unquestionable that the benefits flowing from continued and unwavering recognition of these precious rights inure to children and parents alike. I do not question the state's legitimate interest in protecting children from neglectful or unfit parents. But the right of family integrity should not be swallowed up by the belief of social workers, well-intentioned as they may be, that the child will receive better care or develop more fully in another set-

ting. *See Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Arizona Department of Public Welfare v. Barlow*, 80 Ariz. 249, 296. P.2d 298 (1956).

As the United States Supreme Court has recognized:

"Studies * * * suggest that social workers of middle-class backgrounds, perhaps unconsciously, incline to favor continued placement in foster care with a generally higher-status family rather than return the child to his natural family, thus reflecting a bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the children." *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 834, 97 S.Ct. 2094, 2104, 53 L.Ed.2d 14, 29 (1977).

The real danger of an erroneous determination influenced by impermissible considerations compels that courts be required to reach the termination decision only by evidence capable of withstanding the most exacting scrutiny the courts can muster. A preponderance standard is inappropriate in termination proceedings because, to a trial judge, anything can preponderate since his discretion to disregard testimony he would prefer to ignore is almost unbridled.