#24281-a-DG

**2008 SD 11**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

  v.

ADRIAN FOOL BULL,                               Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE PETER H. LIEBERMAN
Judge

* * * *

LAWRENCE E. LONG
Attorney General

STEVEN R. BLAIR
Assistant Attorney General
Pierre, South Dakota                            Attorneys for plaintiff
                                                and appellee.

TRACI SMITH
Office of the Minnehaha
 County Public Defender
Sioux Falls, South Dakota                       Attorneys for defendant
                                                and appellant.

* * * *

CONSIDERED ON BRIEFS
ON NOVEMBER 6, 2007

OPINION FILED **02/06/08**

#24281

GILBERTSON, Chief Justice

[¶1.] On January 25, 2006, Adrian Fool Bull (Fool Bull) was indicted on one count of rape through the use of force, coercion, or threats in violation of SDCL 22-22-1(2). A jury trial commenced in the South Dakota Second Judicial Circuit on June 12, 2006. On June 15, 2006, the jury returned its verdict, finding Fool Bull guilty as charged. He was sentenced to 45 years in the South Dakota State Penitentiary. We affirm.

## FACTS AND PROCEDURE

[¶2.] On the night of January 20, 2006, Fool Bull walked from his home to the Top Hat, a drinking establishment in downtown Sioux Falls, South Dakota. While there, he encountered a friend, Morgan Lorang (Lorang), who was accompanied by R.B. Lorang introduced Fool Bull to R.B. as "Stoney." According to R.B., the three sat at a booth and conversed for a time before Fool Bull left and walked away.

[¶3.] At Fool Bull's trial, R.B. testified that around midnight she left the Top Hat and walked to her van, parked nearby on the street. R.B. stated that as she entered the van, Fool Bull, who was recovering from a knee injury and walked with a cane, appeared and asked for a ride. R.B. agreed and Fool Bull entered the van, sitting on the passenger side.

[¶4.] R.B. testified that after the two drove away, Fool Bull directed her to the home of his drug dealer. When they arrived, there were no lights on at the house. R.B. stated that Fool Bull grabbed the keys from the ignition and went to the door of the house. R.B. indicated that when Fool Bull returned from the house, he told her that he wanted to drive. R.B. testified that initially she refused to allow

-1-

him to drive and that Fool Bull then punched her in the face. R.B. stated she then relented, moving to the passenger seat, and Fool Bull got into the driver's seat and drove away.

[¶5.] R.B. testified that after taking control of the van, Fool Bull drove her to another neighborhood and parked in a location where the nearby streetlight was broken. R.B. alleges that at this point she attempted to leave the van, first reaching for her purse in the back seat. R.B. stated that as she reached for the purse, Fool Bull again punched her in the face, this time breaking her nose. R.B. indicated that Fool Bull then pushed her down between the two front seats and raped her from behind while punching her repeatedly in the back of the head and neck, threatening to stab her and telling her to "shut the fuck up" while she cried and pleaded with him to stop.

[¶6.] R.B. testified that after the rape, Fool Bull told her to clean herself up and then began driving erratically around town, eventually stopping at a mobile home park off Marion Road in Sioux Falls. Fool Bull took the keys out of the ignition and went up to one of the mobile homes. R.B. stated that she remained in the vehicle because she thought Fool Bull would find her if she tried to leave. Fool Bull returned to the van, and again drove away in an erratic manner.

[¶7.] At around 2:30 a.m. Fool Bull was stopped by Sioux Falls Police Officer Thomas Krull (Krull). Krull testified at trial that while he was speaking to Fool Bull, he looked across the interior of the van at R.B. and noticed her mouth the words "help me." Krull asked to see the vehicle registration and proof of insurance. When R.B. failed to produce the documents, Krull removed Fool Bull from the van.

R.B. indicated that when Krull returned to the van to speak to her, she told him that she had been beaten and raped by Fool Bull.

[¶8.] Fool Bull was arrested for rape. R.B. was taken to Sioux Valley Hospital for treatment of her injuries and to undergo a "rape kit" examination. R.B. was tested for sexually transmitted diseases (STD) and was found to have contracted an STD known as Chlamydia.

[¶9.] On January 25, 2006, Fool Bull was indicted on one count of second degree rape. On May 3, 2006, a hearing was held on Fool Bull's motion for disclosure of "other bad acts" evidence. Fool Bull's trial on the second-degree rape charge commenced on June 12, 2006. Fool Bull's defense was based on mutual consent. The jury returned a guilty verdict on June 15, 2006, and on August 15, 2006, Fool Bull was sentenced to 45 years in the penitentiary.

[¶10.] Fool Bull raises five issues that we will consider on appeal:

1. Whether the trial court abused its discretion by admitting State's evidence that R.B. had contracted a sexually transmitted disease.

2. Whether the trial court abused its discretion by denying Fool Bull's motion for mistrial on grounds of improper testimony by Sioux Falls police officers.

3. Whether the trial court abused its discretion by denying Fool Bull's motion for mistrial on grounds of improper testimony by R.B.'s emergency room treating physician.

4. Whether the trial court abused its discretion by denying Fool Bull's motion for mistrial on grounds of improper statements by the State's Attorney during closing argument.

5. Whether Fool Bull is entitled to a new trial based on prosecutorial misconduct.

## STANDARD OF REVIEW

> We presume the evidentiary rulings made by a trial court are correct, and review those rulings under an abuse of discretion standard. The test for abuse of discretion "is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." If error is found, it must be prejudicial in nature before this Court will overturn the trial court's evidentiary ruling. "Error is prejudicial when, in all probability . . . it produced some effect upon the final result and affected rights of the party assigning it."

State v. Mattson, 2005 SD 71, ¶13, 698 NW2d 538, 544 (internal citations omitted).

Trial courts have considerable discretion in granting or denying mistrials and determining the prejudicial effect of witness statements. State v. Buchhold, 2007 SD 15, ¶50, 727 NW2d 816, 828 (citing State v. Anderson, 1996 SD 46, ¶21, 546 NW2d 395, 401 (citations omitted)). Prejudicial error must be shown for a trial court to grant a motion for mistrial. *Anderson*, 1996 SD 46, ¶21, 546 NW2d at 401 (quoting State v. Myers, 464 NW2d 608, 609-10 (SD 1990) (quoting State v. Blalack, 434 NW2d 55 (SD 1988))) (additional citation omitted)). Prejudicial error sufficient to constitute grounds for a mistrial must in all probability have produced some effect upon the jury's verdict that is concomitantly injurious to the substantial rights of the party assigning it. *Id*. (quoting *Myers,* 464 NW2d at 609-10 (quoting *Blalack*, 434 NW2d 55) (additional citation omitted)).

## ANALYSIS AND DECISION

[¶11.]     **1.      Whether the trial court abused its discretion by admitting State's evidence that R.B. had contracted a sexually transmitted disease.**

#24281

[¶12.] During her medical examination following the incident, Sioux Valley staff tested R.B. for sexually transmitted diseases. Two days later, the test results revealed that R.B. had contracted Chlamydia. Over Fool Bull's objection, the trial court allowed the State to present evidence and elicit testimony about this fact. Fool Bull argues that he did not have an adequate opportunity to refute the inference that R.B. contracted Chlamydia from him. Moreover, he avers that evidence of R.B. having contracted Chlamydia is irrelevant since he does not dispute the fact that he had sexual intercourse with R.B., but rather contends that it was consensual. Thus, Fool Bull contends that admission of evidence about R.B. having Chlamydia is "other acts" evidence, as defined by SDCL 19-12-5 (Rule 404(b)), and only served to prejudice the jury against him.

[¶13.] Fool Bull's argument that he did not have an adequate opportunity to refute the inference that R.B. contracted Chlamydia from him is without merit. During a trial recess, defense counsel stated that she had no intention of eliciting testimony from Fool Bull as to whether he had Chlamydia at the time in question and the record reflects that no such testimony was in fact elicited from him. However, the trial transcript reveals that defense counsel questioned R.B. about having contracted Chlamydia. R.B. testified that she had been in a monogamous relationship and that she did not have Chlamydia prior to the rape incident.

[¶14.] Moreover, Fool Bull's challenge of the admission of evidence about R.B. having Chlamydia, based on relevancy, was not properly preserved for appeal. While defense counsel contested the admission of evidence pertaining to R.B. having Chlamydia during a pretrial conference, the objection was based on the timeliness of State's notice of intent. During R.B.'s direct testimony, Fool Bull

offered no objection as to the relevancy of the State's questioning of her about having contracted Chlamydia. Not until the trial court recessed at the end of the first day's proceedings, following R.B.'s testimony, did defense counsel raise an objection based on relevance. *See* State v. Garton, 390 NW2d 61, 63 (SD 1986) (holding that a defendant's failure to raise a timely objection at trial, but instead waiting to object to State's evidence until after the State had rested waived the issue on appeal) (citing State v. Big Head, 363 NW2d 556, 563 (SD 1985); *In re* T.L.J., 303 NW2d 800, 806 (SD 1981); State v. Reiman, 284 NW2d 860, 870 (SD 1979); *In re* V.D.D., 278 NW2d 194, 197 (SD 1979)); *see also* State v. Dirk, 364 NW2d 117, 123 (SD 1985) (observing that the purpose of the requirement of a prompt objection is "to ensure that the trial court is given a fair opportunity to remedy the impropriety by striking the challenged testimony, promptly admonishing the jury, or taking whatever other action that may be appropriate in the circumstances"); *Big Head*, 363 NW2d at 556 (holding that the trial court's refusal to grant the defendant's motion for mistrial or to strike testimony made in chambers following the completion of testimony was properly denied because "it was too late to lock the barn door, the horses had departed").

[¶15.]     Assuming that Fool Bull had preserved the issue for appellate review, we find his argument on the merits to be unpersuasive. Penetration is a key element of second degree rape that the State must prove under SDCL 22-22-1(2).[1]

---

1.     Under SDCL 22-22-1(2), rape is defined as: "an act of sexual penetration accomplished with any person . . . [t]hrough the use of force, coercion, or threats of immediate and great bodily harm against the victim or other

(continued . . .)

Fool Bull contends that by virtue of his mutual-consent defense, the State is compelled to stipulate that penetration occurred, thus precluding the introduction of other State's evidence related to this element. However, it is a well-established rule that the government is not bound by a defendant's offer to stipulate.[2] State v. Steele, 510 NW2d 661, 674 (SD 1994) (Miller, C.J., concurring in part and dissenting in part); *see also* State v. Huth, 334 NW2d 485, 489 (SD 1983) (holding that crime photos were properly admitted despite the defendant's admission and offer to stipulate because the State still possessed the burden of proving all elements of the charged offense and was entitled to present graphic proof of the relevant facts) (citations omitted); State v. Krana, 272 NW2d 75, 79 (SD 1978) (holding that where the delivery, not quality, of truckloads of corn constituted the basis of the charged crime, the trial court properly admitted samples of the poor quality corn because the corn was *res gestae* of the crime and despite the defendant's offer to stipulate to the truckloads of corn, the State was entitled to present its case as it wished).

[¶16.]     In this case the chronology of the events that begin with Fool Bull's arrival at the Top Hat on January 20, 2006, and end with his arrest by Krull were *res gestae* of the rape. So too were the graphic details of the rape incident; the

---

(. . . continued)
persons within the victim's presence, accompanied by apparent power of execution[.]"

2.     The record does not reveal that Fool Bull made an actual offer to stipulate. Defense counsel merely objected to the introduction of evidence of R.B. having Chlamydia based on Fool Bull's mutual-consent defense.

emergency room medical report that evinced R.B.'s battered body and indicated the presence of Fool Bull's semen and DNA inside of her; and the photographic exhibits taken of R.B. in the emergency room that depict the extent of her injuries. Furthermore, R.B. testified during the trial that she had been in a long term monogamous relationship. Therefore, the fact that shortly after the rape she was found to have contracted Chlamydia, was also *res gestae* of the crime and thus relevant to the State's case. *See* State v. Bunger, 2001 SD 116, ¶11, 633 NW2d 606, 609 (observing that "[t]he law favors admitting relevant evidence no matter how slight its probative value").

[¶17.]     Finally, Fool Bull's assertion that evidence of R.B. contracting Chlamydia was inappropriately admitted "other acts" evidence misinterprets our version of Rule 404(b) found under SDCL 19-12-5. The rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Id.* The State is required to provide notice of intent to use such evidence so that the trial court, in determining admissibility, can balance the probative value of the evidence against the prejudice to the defendant. *Mattson*, 2005 SD 71, ¶18, 698 NW2d at 545.

[¶18.]     As explained in the foregoing analysis, evidence that R.B. had contracted Chlamydia was *res gestae* of *this* crime, not any other crime, wrong or act. Therefore, Rule 404(b) did not apply and we find no error in the trial court's decision to allow the State to present such evidence.

[¶19.]    **2.**    **Whether the trial court abused its discretion by denying Fool Bull's motion for mistrial on grounds of improper testimony by Sioux Falls police officers.**

[¶20.]    During the State's direct examination of Krull, the following exchange took place:

> STATE: And you also talked about a "10-15, number two"?
>
> KRULL: Yeah.
>
> STATE: What's that?
>
> KRULL: "10-15" is a person in custody, and "number two" is our code for . . . rape. . . . [Ten]-15, number two, that tells the officer that I want him to take the individual into custody and why.
>
> STATE: So you were saying in . . . layman terms, that you wanted the other officer to take who into custody and why?
>
> . . .
>
> KRULL: I was saying put handcuffs on Mr. Fool Bull because he may have been involved in a number two.
> . . .
> Or in a rape, . . .
> . . .
> That's for safety, both his and ours. I wanted to get the cane away from him. He may have just been involved in a violent crime, I don't want him to have a weapon in hand, and as I said before, *I am familiar with the gentleman and I wanted him in handcuffs.*

(Emphasis added).

[¶21.]    At the conclusion of the State's case-in-chief, defense counsel moved for a mistrial in part on the basis of Krull's statement that he was familiar with Fool Bull and that the statement was some how prejudicial thereby circumventing his right to a fair trial. However, defense counsel raised no objection to the statement

during Krull's testimony. Therefore, the matter is waived on appeal. *See Garton*, 390 NW2d at 63 (citing *Big Head*, 363 NW2d at 563; *T.L.J.*, 303 NW2d at 806; *Reiman*, 284 NW2d at 870; *V.D.D.*, 278 NW2d at 197).

[¶22.]    The State also called on Sioux Falls Police Officer Steve Redmond (Redmond) to testify during its case-in-chief. Redmond responded to Krull's request for back-up after Fool Bull and R.B. had been stopped. During Redmond's testimony, the following exchange took place:

> STATE:      What is [Fool Bull's] response to the fact that he is being arrested for rape?
>
> REDMOND:  He was upset.
>
> STATE:      Verbally, what does he say?
>
> REDMOND:  *That he always gets charged with this*, um, I don't –
>
> DEFENSE :  Objection.

(Emphasis added).

[¶23.]    On May 3, 2006, the trial court conducted a motions hearing wherein Fool Bull sought to suppress Rule 404(b) "other acts" evidence comprising convictions for misdemeanor false impersonation and felony conspiracy to commit aggravated assault. The trial court agreed to suppress the misdemeanor, but, in reference to the felony, granted the State the right to inform the jury of his conviction and the date thereof. The State agreed and the court then ordered that there be notice and hearing of any other 404(b) evidence that the State should seek to introduce. Fool Bull argues that Redmond's remark constitutes Rule 404(b), "other acts" evidence that required notice and hearing prior to admission. We

agree. Yet, while the remark was inappropriate, we cannot construe that it was injurious to Fool Bull's substantial right to a fair trial. Since Fool Bull cannot show how the remark rises to the level of prejudicial error, it does not constitute a basis for mistrial. *See Anderson*, 1996 SD 46, ¶21, 546 NW2d at 401 (reiterating that an actual showing of prejudice must exist in order to justify a mistrial) (quoting *Myers*, 464 NW2d at 609-10 (quoting *Blalack*, 434 NW2d 55) (additional citation omitted). Hence, we find no abuse of discretion.

[¶24.]    **3.    Whether the trial court abused its discretion by denying Fool Bull's motion for mistrial on grounds of improper testimony by R.B.'s emergency room treating physician.**

[¶25.]    During its case-in-chief, the State called Dr. Janelle Simpkins (Simpkins) to testify. Simpkins was the Sioux Valley Hospital emergency room physician on duty when law enforcement transported R.B. to the hospital for examination. Fool Bull objected to several statements by Simpkins during her testimony. He subsequently moved for a mistrial alleging the statements to have violated his right to a fair trial.

[¶26.]    Simpkins had been an emergency room physician at Sioux Valley for 12 years and estimated that on average she had treated two rape victims per month. Following the examination of R.B., medical staff completed a report, to which Simpkins contributed, based on evidence collected in a "rape kit." The information was provided to Fool Bull prior to March 9, 2006. The "rape kit" and report were received into evidence as State's exhibits. Simpkins offered testimony relevant to the "rape kit" and information that had been entered in the report.

[¶27.]     Simpkins testified in detail about the nature of R.B.'s injuries. Her extensive injuries included bruises around the right side of the face and eye, a cut lip, a broken nose, a swollen scalp and bruises to the back of the head and neck, bruising on the left breast and bruising on the right thigh. However, R.B. had no sign of vaginal injury. Simpkins estimated that in her experience, about half of rape cases do not result in vaginal injury. She indicated that it is particularly common for there to be no injury to the vaginal area in women who are sexually active or have given birth to a child. Despite this explanation, Fool Bull objected to Simpkins's assessment that R.B. "obviously, was a victim of violence[.]"

[¶28.]     Simpkins referred to the bruising on R.B.'s right leg as "grab marks." She stated that the grab marks were indicative of those left by "finger prints." Over Fool Bull's objection, Simpkins stated that such grab marks can be caused by someone forcibly attempting to spread a person's legs. Fool Bull alleges that Simpkins's statement was irrelevant and merely intended to inflame juror passion because he argues there was no evidence that R.B.'s legs were forcibly opened since she contends to have been raped from behind.

[¶29.]     While the State offered Simpkins's testimony as an observer in the emergency room, her testimony as to R.B. being a victim of violence and the nature of the grab marks amount to expert testimony. If it will assist the trier of fact to understand the evidence or to determine a fact in issue, a qualified expert by knowledge, skill, experience, training, or education, may testify to specialized knowledge in the form of an opinion or otherwise. SDCL 19-15-2 (Rule 702). Our

analysis in *State v. Andrews*, 2001 SD 31, 623 NW2d 78 is instructive to the analysis of the issue raised here by Fool Bull.

[¶30.] In *Andrews,* the State was permitted to introduce non-expert testimony from a law enforcement officer about his personal observations as to the general operating characteristics of a firearm used in a homicide. *Id.* ¶15. The defendant asserted that the firearm had discharged accidentally. *Id.* ¶14. During a pretrial hearing, the trial court limited the law enforcement officer's testimony by denying the State's request to allow the officer to offer a technical opinion as to the likelihood of accidental discharge based on his experience with firearms. *Id.* ¶15. Despite the trial court's ruling, the law enforcement officer was permitted to testify at length during the trial as to his conclusions about the likelihood of accidental discharge even though he had no independent knowledge of the shooting and the State had not provided the defendant with the officer's written findings within a reasonable time before trial. *Id.* ¶¶14, 16, 18. We found that under these circumstances, the trial court erred in allowing the law enforcement officer, without independent knowledge of the crime, to offer technical opinion testimony. *Id.* ¶19. The facts of the instant case are distinguishable.

[¶31.] The record indicates that Fool Bull was provided all medical records related to R.B.'s treatment at least three months in advance of trial. Simpkins's assessment that R.B. was the victim of a violent crime and her description of the grab marks on R.B.'s leg, were derived from first-hand knowledge obtained during the emergency room examination. Simpkins's possible explanation of why R.B., who was in a sexually active monogamous relationship and had given birth to two

children, had not sustained vaginal injury, even though she claimed to have been raped, was based on her experience as a doctor and emergency room physician dealing with rape victims on a regular basis. Similarly, her explanation that the frequent cause of grab marks, like those on R.B.'s leg, being caused by forcible prying of the legs was also based on her experience as a physician.

[¶32.] On redirect, Simpkins testified that R.B. identified her assailant as "Stoney." This testimony related to information compiled in a data sheet at the time of the emergency room examination. The nature of Simpkins's redirect testimony in this regard was as follows:

> STATE: I'm going to show you what is marked as State's Exhibit No. 21.[3]
> . . .
> [This] actually, came out of the rape kit?
>
> SIMPKINS: Yes.
>
> STATE: Who completed that portion of the victim's medical history?[4]
>
> SIMPKINS: I did.
>
> STATE: And have you indicated on there whether or not she told you the name of her assailant?
>
> SIMPKINS: She didn't know the name. She said he had a nickname of "Stoney."
>
> STATE: So as you look at these pages, these are the pages that you completed?

---

3. State's Exhibit No. 21 was a collection of data compiled by Simpkins during R.B.'s emergency room examination.

4. The referenced page is entitled, "Victim's Medical History And Assault Information."

[¶33.] At this time, the trial court asked the attorneys to step forward for a bench conference. Although the bench conference was conducted off the record, Fool Bull alleges that the trial court warned the State that if Simpkins continued to offer her opinion as to whether he had raped R.B., a mistrial would be granted.

[¶34.] With respect to this redirect testimony, we do not find that it was an expression of Simpkins's opinion as to Fool Bull's guilt or in anyway bolstered R.B.'s account of the incident. *See* State v. Raymond, 540 NW2d 407, 409-10 (SD 1995) (*Raymond I*) (noting that "'[t]he general rule . . . is that one witness may not testify as to another witness' [sic] credibility or truth-telling capacity because such testimony would invade the exclusive province of the jury to determine the credibility of a witness'") (quoting McCafferty v. Solem, 449 NW2d 590, 592 (SD 1989); *accord* State v. Logue, 372 NW2d 151, 157 (SD 1985); SDCL 19-15-2). Rather, it was, if anything, a harmless reiteration of testimony that had already been given at length by R.B. and was obviously at issue since a trial had been convened. *See* State v. Thomas, 381 NW2d 232, 240 (SD 1987) (holding, where a witness properly testified that she had been raped by the defendant and a psychologist thereafter testified that the witness had told him the same thing, the psychologist's testimony was merely cumulative to the witness's testimony and thus not prejudicial to the defendant). Moreover, an impartial expert may testify to a report prepared by himself or herself or with information provided by others so long as it is provided to the adverse party a reasonable time before trial. SDCL 19-15-

5.2 (Rule 705(b));[5] SDCL 19-15-6 (Rule 705(c)).[6] Simpkins was citing to State's

Exhibit No. 21 that included the "Victim's Medical History And Assault

Information" data sheet from the "rape kit" that she compiled during R.B.'s

emergency room examination. "Number 19" on the data sheet provides a space on

---

5. Rule 705(b) provides:

A written report or finding of facts prepared by an expert not being a party to the cause, nor an employee of a party, except for the purpose of making such report or finding, nor financially interested in the result of the controversy, and containing the conclusions resulting wholly or partly from written information furnished by the cooperation of several persons acting for a common purpose, shall, in so far as the same may be relevant, be admissible when testified to by the person, or one of the persons, making such report or finding without calling as witnesses the persons furnishing the information, and without producing the books or other writings on which the report or finding is based, if in the opinion of the court, no substantial injustice will be done the opposite party.

SDCL 19-15-5.2

6. Rule 705(c) provides:

The report or finding described in [Rule 705(b)] shall not be admissible unless the party offering it shall have given notice to the adverse party a reasonable time before trial of his intention to offer it, together with a copy of the report or finding, or so much thereof as may relate to the controversy, and shall also have afforded him a reasonable opportunity to inspect and copy any records or other documents in the offering party's possession or control, on which the report or finding was based, and also the names of all persons furnishing facts upon which the report or finding was based, except that it may be admitted if the trial court finds that no substantial injustice would result from the failure to give such notice.

SDCL 19-15-6.

which to enter the "Assailant's Name." As such it was an appropriate reference by Simpkins to a report as provided under Rules 705(b) and 705(c).[7]

[¶35.]     Over Fool Bull's hearsay objection, Simpkins also testified to the account of the incident as told to her by R.B. Simpkins indicated that R.B. expressed to her that she feared she might have been killed had Fool Bull not been stopped by the police. We find that the trial court erred by allowing this testimony. However, the trial court's error does not constitute a basis for reversal given the overwhelming evidence against Fool Bull. Moreover, the State's photo exhibits of R.B. and medical record exhibits, testified to by Simpkins, provided a reasonable evidentiary basis upon which the jury could conclude R.B.'s concern was sincere.

[¶36.]     Finally, Fool Bull objected to Simpkins's unsolicited, inadvertent statement, "I am absolutely convinced that what she said took place took place." This statement did invade the province of the jury. *See Raymond I*, 540 NW2d at

---

7.     We also note that on this basis, Simpkins's testimony as to the identity of the assailant was also admissible as a business record and thus hearsay exception under SDCL 19-16-10 (Rule 803(6)). Rule 803(6) provides:

*A memorandum, report, record, or data compilation*, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, *if kept in the course of a regularly conducted business activity*, *and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation*, all as shown by the testimony of the custodian or other qualified witness, is not excluded by § 19-16-4, even though the declarant is available as a witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term *"business" as used in this section includes* business, institution, association, *profession*, occupation, and calling of every kind, whether or not conducted for profit.

*Id.* (emphasis added).

409-10 (citations omitted).  Fool Bull cites *Raymond I*, *State v. Logue*, 372 NW2d 151 (SD 1985)**,** and *State v. Jenkins*, 260 NW2d 509 (SD 1977) to support his assertion that this infringement necessitated a mistrial, thus requiring this Court to reverse.  However, the manner in which the statements were made in the cases cited by Fool Bull and the actions of the respective trial courts are distinguishable from the instant case.

[¶37.]        In *Raymond I*, the defendant was accused of sexual contact with a minor.  540 NW2d at 408.  The allegations came to light when the victim informed a social worker about an incident, during which the defendant "touched her."  Since the victim was a minor, younger than 10 years of age, the State filed a notice of intent to offer the child's incriminating hearsay statements made to social workers.  At a pre-trial hearing, the trial court allowed the hearsay testimony, conditioned on the State's expressed intent that the social workers' testimony would be limited to the hearsay.  Contrary to its representation, at trial the State elicited testimony from one of the social workers that went to the veracity of the minor child's statements.  The social worker testified that the child's statements were credible. *Id*. at 408 n4.  The defendant objected and the record reflected that the trial court agreed with the objection.  *Id*. at 408.  Nevertheless, it failed to admonish the jury to disregard the statement or reiterate the roles of witnesses and the jury.  Subsequently, the State elicited a second social worker's opinion about the truthfulness of the child's statements.  *Id*. at 409.  Thereafter, the defendant's motion for mistrial was denied and he was convicted.  In reversing the trial court,

we concluded that the social workers' testimony bolstered the credibility of the minor child and denied the defendant his right to a fair trial. *Id.* at 410.

[¶38.] The defendant in *Logue*, was also convicted of sexual contact with a minor child. 372 NW2d at 155. At trial, the State called a social worker to testify that she had interviewed the child. *Id.* at 154. Over the defendant's objection, the trial court allowed the State to question the social worker as to her opinion about where the minor child's knowledge of sexual matters had been obtained. *Id.* at 155. The social worker stated her opinion was that the child's knowledge had been obtained from the defendant. In reversing the defendant's conviction, this Court stated that the social worker's testimony was objectionable "not 'merely because it embraced an ultimate issue of fact,'" but more significantly because it "lent a stamp of undue legitimacy" to the credibility of the minor child. *Id.* at 157.[8]

[¶39.] The defendant in *Jenkins* was convicted of murder. 260 NW2d at 511. The defendant conceded that he had killed the victim. *Id.* at 513. The only question presented to the jury was whether he had been forced to do the killing by others. At trial, the State called a psychologist to testify, who had interviewed the defendant.

---

8. South Dakota adopted FRE 704, the ultimate issue doctrine pertaining to opinion testimony, in 1993 with the enactment of SDCL 19-15-4. *See* SD Sess Laws 1993 ch. 401. SDCL 19-15-4 provides:

   Testimony in the form of an opinion or inference *otherwise admissible* is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

   (Emphasis added). As this analysis of our case law shows, the propriety of opinion testimony ends where the fact finder's purview to assess the credibility of witnesses begins.

#24281

Over the defendant's objection, the trial court allowed the State to question the psychologist as to his opinion about whether the defendant was truthful in his claim that the killing had been forced. The psychologist testified that he believed the defendant's claim was unfounded. In reversing the defendant's conviction we opined that under the circumstances, allowing the defendant's conviction to stand "would virtually abolish the historic and cherished concept that a jury of twelve fellow citizens is the proper tribunal for judging credibility." *Id*.

[¶40.]    Unlike each of the cases cited by Fool Bull, where the State elicited the objectionable testimony, the comment of Simpkins, regarding her assessment of R.B.'s account of the rape, was *inadvertent, and unsolicited* as the following excerpt from the trial transcript reveals:

> STATE:    In rape examinations that you've performed over 12 years, how often did you see injuries to a woman's vagina.
>
> SIMPKINS: I think less than half of the time.
>
> STATE:    So when you didn't see injuries to [R.B.'s] vagina, how, if at all, did that impact your diagnosis?
>
> SIMPKINS: It didn't at all. She, obviously, was a victim of violence, multiple bruising, broken nose, a scalp injury, and had discharge and hair consistent with ejaculation. *I am convinced that what she said took place took place.*
>
> DEFENSE:  Objection. Your Honor, may we approach?
>
> COURT:    Yes.

[¶41.]    Additionally, unlike each of the cases cited by Fool Bull, the trial court in the instant case issued a lengthy admonition to the jury following Simpkins's objectionable opinion. Immediately after the exchange transcribed in the preceding

-20-

excerpt, the trial court conducted a bench conference with the attorneys.

Thereafter, the trial court issued the following admonishment.

> Members of the jury, the doctor is here to tell us about
> medical things.  It's up to the jury to decide what happened.
> As I said to you yesterday about people opinion's [sic]
> who have not sat through the trial, they are not worth
> as much as the opinion of your fellow jurors.  So I am
> going to ask the jury, and I am going to require the jury,
> to disregard the statement that Dr. Simpkins just made
> that she's convinced that what [R.B.] said did happen.
> It's your decision, members of the jury, to decide what
> happened.  It is the doctor's role to give us medical
> testimony.  That went beyond medical testimony, and
> that is why I am telling the jury not to disregard all of
> her testimony, just that final statement that she believes
> that something violent and bad happened here.  That is
> completely up to the jury.  So I am requesting that you
> disregard that statement. . . .

[¶42.]     It is unclear what if any limiting instructions that the juries in the cases cited by Fool Bull took with them into deliberations.  However, in the instant case, while the trial court later denied defense counsel's motion for mistrial on this basis, it offered to consider a jury instruction addressing defense counsel's concerns that Simpkins's remarks may have affected Fool Bull's right to have the jury judge the credibility of R.B.'s testimony.  The following instruction, offered by defense counsel, was settled as jury instruction #27, entitled "WHETHER THE CRIME CHARGED HAS BEEN PROVEN BEYOND A REASONABLE DOUBT IS A MATTER FOR THE JURY TO DECIDE:"

> You are the sole and exclusive judges of all questions of
> fact and the credibility of the witnesses and the weight
> to be given the testimony of each of them.  In determining
> the credit to be given any witness you may take into
> account ability and opportunity to observe, memory, manner
> while testifying, any interest, bias, or prejudice, and the
> reasonableness of the testimony considered in the light

of all the evidence in the case. *A witness may not, however, express an opinion as to whether a crime; in this case, the crime of rape, has occurred. To the extent that any witness in this case has expressed such an opinion, you must disregard that opinion.* Whether the elements of rape in the second degree have been proven beyond a reasonable doubt is a matter for this jury to decide.

(Emphasis added).

[¶43.]     Simpkins's statement was inadvertent and unsolicited by the State. The trial court promptly reacted to the statement. Thereafter, it took all reasonable measures to ensure that any potential effect the statement might have had on the jury was minimized by issuing a clear admonition, *see Anderson v. Johnson,* 441 NW2d 675, 677 (SD 1989) (reiterating our settled law that we assume juries accept admonitions), and including defense counsel's proposed jury instruction.

[¶44.]     Based on its assessment of the effect or lack thereof that Simpkins's statement had on the jury, the trial court denied Fool Bull's motion for mistrial. Therefore, in lieu of any other evidence that Simpkins's statement unduly prejudiced the jury, thus denying Fool Bull his right to a fair trial, we will not substitute our judgment for that of the trial court, which was present in the courtroom with the jury. *See* State v. Havens, 264 NW2d 918, 923 (SD 1978) (affirming the trial court's decision not to grant a mistrial for objectionable argument by the State and acceding to its judgment lacking the defendant's showing of any actual bias or prejudice because "[t]he trial [court] was on the scene, had heard the arguments and had the opportunity to note whether they had any apparent effect on the jury").

[¶45.]    **4.    Whether the trial court abused its discretion by denying Fool Bull's motion for mistrial on grounds of improper statements by the State's Attorney during closing argument.**

[¶46.]    At trial, defense counsel questioned R.B. about her boyfriend not believing that she had been raped when she first called him shortly after Fool Bull's arrest.  Fool Bull alleges that the State made objectionable remarks during closing argument that were aimed at assuaging any reasonable doubt about his guilt raised during this line of questioning that warranted the trial court's granting his motion for mistrial.  He argues that the following remarks were an attempt to appeal to the "community conscience," and an invitation to the jury to put themselves into R.B.'s situation:

> Think about it, members of the jury.  Think about if you've ever been in a situation even remotely close to that. However, if in an automobile accident, or say you've been hit.  [Y]ou've been hit in an automobile accident and under the stress of this moment and you call up your spouse and you tell your spouse you've been in an . . . automobile accident or just tell him or her you were in an automobile accident and I am okay?  I was driving on 41st street and this car rear ended me.  I'll talk to you about it later.  I was struck one time in my car.  The van came up to the window, you know, I can't talk to you about it right now. I am so angry right now, I can't talk to you about it.  I was so upset that I knew better to talk about it right then, but try to put yourself in a stressful situation and in a situation where you've been the victim of a rape or some other similar situation where you've been the victim of an automobile accident.

Following defense counsel's objection, which was overruled by the trial court, the

State continued:

> Think about how you would relate. How would you relate
> to somebody when you explain what happened? Would
> you go through every single detail or a quick version because
> you're a victim, you're hurt, perhaps on the way to go to
> the hospital?

[¶47.] "Arguments that invite the jurors to put themselves in the shoes of a victim are generally improper." State v. Blaine, 427 NW2d 113, 115 (SD 1988) (citation omitted). However, a prosecutor "may make remarks, not based on the record, which concern matters of general knowledge *or experience*." State v. Smith, 1999 SD 83, ¶46, 599 NW2d 344, 354 (emphasis added) (citation omitted).

[¶48.] The State's remarks do not seem intended to evoke the emotional response that results when a jury is asked to put itself in the shoes of the victim as the alleged criminal act is being perpetrated and for which we might conclude undue prejudice could result. However, it appears that the State's remarks were an attempt to evoke recollections of a general incident so as to project the jury into the kind of stress that R.B. experienced and that may consequently have affected her actions following the rape. Fool Bull avers the following remarks also warranted mistrial:

> [T]he Defendant in his story about what happened that
> night, and bear in mind, he has had five months to work
> on this story, and I want you to remember how he told
> his story. The defense attorney didn't ask questions, the
> Defendant took the stand and started on his story, and
> kept going and going and going, there were very few
> questions. At one point and time, the Defense attorney
> interrupted him with a question and he was, kind of, like,
> you know, hey, but –

Following defense counsel's objection at this point that was overruled by the trial

court, the State continued:

> He was so adamant about finishing what he wants to talk
> about right then because he was so prepared with his story
> – don't interrupt me.  I want to tell my story before I forget
> what I want to say.

[¶49.]     Although the State may comment on the credibility of witnesses during

final argument, *see Jenner v. Leapley*, 521 NW2d 422, 428 (SD 1994) (citing State v.

Howard, 323 NW2d 872, 874 (SD 1982)), here again the State appears to attempt to

project the jury into the mindset of another – in this case Fool Bull during his

testimony.

[¶50.]     While we do not condone the kind of prosecutorial conduct evinced by

these remarks, the weight of evidence against Fool Bull was otherwise

overwhelming.  Under the circumstances, Fool Bull fails to show how these remarks

prejudiced his right to a fair trial.  Therefore, we will not disturb the jury's verdict

on this basis.

[¶51.]     **5.     Whether Fool Bull is entitled to a new trial
                     based on prosecutorial misconduct.**

[¶52.]     Fool Bull alleges prosecutorial misconduct on three grounds:

1.     The impropriety of the State's line of questioning of
       Simpkins in regard to "grab marks" on R.B.'s leg.

2.     The impropriety of certain remarks by the State
       during closing argument.

3.     The impropriety of statements made by the State
       at Fool Bull's sentencing hearing.

[¶53.]     We have addressed Fool Bull's claims of impropriety in regard to the

"grab marks" line of questioning.  *See* Issue 3.  The remarks during closing

argument that Fool Bull alleges were improper were addressed under Issue 4. Therefore we need not readdress his first two claims of prosecutorial misconduct.

[¶54.]    Fool Bull's third ground for prosecutorial misconduct arises from an allegation made by the State during the sentencing hearing that he had committed a murder when he was 12 years old. When defense counsel objected, the trial court assured that the remark would not be considered in the determination of sentence. The State subsequently apologized for the remark.

[¶55.]    While we agree the State's remark was improper, it has no relevance to the issue of whether he received a fair trial since he already had been convicted by the time it was made. As to whether the remark affected his sentence, which Fool Bull does not argue on appeal and we would not otherwise consider, Fool Bull offers no reason why we should question the sincerity of the trial court. The grounds cited by Fool Bull upon which he alleges prosecutorial misconduct, justifying a new trial are without merit.

[¶56.]    We have examined the remaining issues raised by Fool Bull and find them to be similarly without merit.

[¶57.]    Affirmed.

[¶58.]    SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.

[¶59.]    ZINTER, Justice, concurs with a writing.


ZINTER, Justice (concurring).

[¶60.]    I concur. I write to note my view of Dr. Simpkins's testimony repeating the victim's statement that the defendant ("Stoney") was the perpetrator.

*See supra* ¶¶32-34.  In my view, contrary to the Court, the *testimony* was an inadmissible prior consistent statement that did bolster the victim's account of the incident.  Nevertheless, I concur because it was a harmless reiteration of the identical information taken from Exhibit 21 (the rape kit).

[¶61.]       I also write to note that, contrary to the Court's view (*see supra* ¶34), SDCL 19-15-5.2 and SDCL 19-15-6 (Rule 705(b) and (c)) are not intended to permit the admission of expert *testimony*.  Those statutes are part of the Uniform Composite Reports as Evidence Act.  SDCL 19-15-8 (Rule 705(e)); Hilde v. Flood, 81 SD 25, 33, 130 NW2d 100, 104 (1964).  Therefore, these statutes are only intended to permit the admission of a "written report or findings of fact prepared by an expert."  SDCL 19-15-5.2 (Rule 705(b)).  They are not authority to justify admission of Simpkins's *testimony*.  Again, however, I concur because Dr. Simpkins's testimony merely reiterated what was in the report, which was admitted into evidence.