#25251-a-DG

**2010 SD 43**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                Plaintiff and Appellee,

v.

JULIO JUAREZ RALIOS,                                Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE PATRICIA C. RIEPEL
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

MEGHAN N. DILGES
Assistant Attorney General
SHERRI SUNDEM WALD
Deputy Attorney General
Pierre, South Dakota                                Attorneys for plaintiff
                                                    and appellee.

JEFF LARSON
Minnehaha County Public
 Defender's Office                                Attorneys for defendant
Sioux Falls, South Dakota                          and appellant.

\* \* \* \*

ARGUED MARCH 24, 2010

OPINION FILED **06/09/10**

#25251

GILBERTSON, Chief Justice

[¶1.]		Defendant was convicted of second degree rape in violation of SDCL 22-22-1(2).  He appeals the trial court's denial of his motion to suppress statements made to police during a custodial interrogation and various evidentiary rulings.  We affirm.

## FACTS

[¶2.]		Defendant Julio Juarez-Ralios, while using the name "Antonio," met E.C. in 2005 in Sioux Falls.  The two dated and had a sexual relationship for two months.  They lost contact after the relationship ended until 2007 when they saw each other at a "Spanish Dance" in Sioux Falls.  Defendant telephoned E.C. later that evening and asked if he could stay at her home as he did not have a ride home.  E.C. allowed Defendant to stay on her couch.  He left the next morning without incident.

[¶3.]		On March 8, 2008, while attending a "Spanish Dance" in Sioux Falls, E.C. saw Defendant again and they exchanged cell phone numbers.  Defendant called E.C. sometime after 3 a.m. on March 9, and once again asked if he could stay at her home.  E.C. let Defendant into her home and provided him with the use of her couch.  E.C. retired to her bedroom with her one-year-old child.  Defendant entered E.C.'s bedroom, sat on her bed, and spoke with her for a few minutes before asking for sex.  E.C. declined.  Defendant then held E.C. down on the bed and despite her protests and resistance raped her while she cried.  E.C.'s one-year-old daughter was in a portable crib at the foot of the bed during the rape and began crying during the assault.  After the rape, Defendant called a taxi and was taken to

-1-

another residence in Sioux Falls. E.C., crying, hyperventilating, and struggling to speak, called 911 within three minutes of the sexual assault. E.C. named "Antonio" as the assailant.

[¶4.] Sioux Falls Police Officers Matt Vandervelde and Brian Warwick arrived at E.C.'s home and quickly determined Defendant had called a taxi, which had picked him up outside E.C.'s home, and it was taking him to an apartment building at 901 North Dakota Avenue. Officer Warwick remained at E.C.'s home and obtained the basic information about the assailant from E.C. He also photographed the scene and bagged evidence.

[¶5.] Officer Vandervelde departed for the address given to him by the taxi company that picked Defendant up in front of E.C.'s apartment. Officer Vandervelde arrived at the location before Defendant and determined that Defendant was a known acquaintance of the two male occupants of apartment number three. While standing outside apartment number one, Officer Vandervelde saw Defendant exit the taxi and begin to walk toward apartment number three. When Defendant saw Officer Vandervelde, he changed direction and began to walk away. Officer Vandervelde said "stop" and Defendant complied. Officer Vandervelde approached Defendant, who identified himself as "Jamie Cruz Wilkens." Defendant provided a picture identification card with that name and his photograph.

[¶6.] Officer Vandervelde returned to E.C.'s apartment where he showed her three picture identification cards, including the Defendant's and those of the other two male occupants of apartment number three. E.C. was able to identify

Defendant "Antonio" from the photo as her assailant. E.C. was transported to a local emergency room. She was examined by physician Dr. Shelly Driver. A rape kit examination was also performed. Dr. Driver determined that E.C. had a purplish lesion on her neck and was experiencing pain and burning in her pelvic region. Dr. Driver also noted erythema, or redness in the vaginal opening that appeared to be new. The examination also revealed a swab of discharge consistent with the appearance of semen. Dr. Driver noted E.C. was shaken, very upset, tearful, and slightly anxious. Officer Warwick interviewed E.C. briefly at the hospital. He also collected the blanket E.C. wrapped herself in after the rape and the rape kit from the hospital.

[¶7.] Defendant was asked to accompany the police to the Sioux Falls Law Enforcement Center. Defendant agreed. While in custody, Defendant spoke in English and appeared to comprehend all directions and requests made of him. Defendant asked to use the restroom and was escorted there by an officer. When Defendant asked the officer to leave the room, he was told that the officer could not leave Defendant unaccompanied. When Defendant tried to wash his hands, the officer told him not to because police would be obtaining a search warrant for possible evidence that Defendant had on his hands. Defendant appeared to understand and complied with the directive. Defendant then waited in an interrogation room for approximately forty-five minutes before questioning began at around 5:47 a.m. Defendant slept for part of that time.

[¶8.]     Detective Olson of the Sioux Falls Police Department conducted the interrogation.[1]  Before reading Defendant his *Miranda* warning, Officer Olson said: "Just to let you know, before you can talk to me, need to let you know about your *Miranda* rights.  I do want to talk to you and get your side of the story."  Detective Olson then read the following advisement in an unhurried and steady manner: "You have the right to remain silent.  You can stop questioning at any time.  Anything you say can be used against you.  You have the right to consult with an attorney.  If you cannot afford an attorney, one will be provided to you."  After reading Defendant his *Miranda* warning, the following colloquy took place between Defendant and Detective Olson:

Olson:     Do you understand the rights I just read to you?

Defendant:  [Defendant nods affirmatively]

Olson:     Would you be willing to waive your rights and talk to me?

Defendant:  I don't know.  I don't know why I'm here dog.

Olson:     Well, that's if you want to waive your rights and talk to me.  I'd be more than happy to fill you in as far as to what I know.

Defendant:  I don't know what's going on.  I have no idea.

Olson:     Okay.  Well, would you be able to waive your rights and talk to me.

Defendant:  I came from work to visit a friend.

Olson:     [Stops Defendant with a hand gesture] Okay.  I need to know if you'll waive your rights and talk to me though before we go any further.  Is that all right?  You willing to talk to me?

Defendant:  Just let me visit my friend.

---

1.     The interview was videotaped and is part of the court record.

Olson: [Stops Defendant once again with a hand gesture] Okay. Are you willing to talk to me?

Defendant: Yeah.

[¶9.] While in custody, Defendant gave his name as "Wilkens." Defendant was able to give his address, cell phone number, and home telephone number when asked. Upon request from Detective Olson, Defendant produced a cell phone from his right pants pocket. Defendant explained that it did not have service as the bill had not been paid. Detective Olson was able to see past dates, times, and numbers called on the cell phone. Detective Olson asked Defendant several questions about past calls that appeared on the cell phone. Defendant appeared to understand all questions, and his replies were consistent with an understanding of the questions posed to him.

[¶10.] Defendant initially denied being with any woman that evening, denied having had sex, claimed to be from Puerto Rico, and denied knowing E.C. Defendant was able to give an accounting of his past cities of residence and years in which he resided in Texas, Kansas, and Puerto Rico. When asked about his immigration status and whether he possessed a valid social security card, Defendant claimed he was a legal alien and recited a social security number from memory. He then produced a social security card with that number from his wallet.

[¶11.] Detective Olson told Defendant of the rape allegations and that a search warrant to collect DNA evidence from his person was being sought. Defendant asked what would happen next. Detective Olson replied that Defendant would be arrested. Defendant asked for how long and was told it would be for a while.

[¶12.]    Defendant then changed his story. He claimed a random woman called him on his cousin "Chivo's" cell phone and wanted him to come over for sex and he did. Defendant claimed he could not remember the woman's name or address. He also claimed that after they started having sex, the woman said no, so he stopped. He later changed his story, stating that the woman thought he was her boyfriend when she called. Then once the woman realized while the two were having sex that Defendant was not her boyfriend, she said "stop," and Defendant immediately stopped and left after calling a taxi. Initially, he claimed the woman was white; later in the interview he claimed she was black.

[¶13.]    When asked how he called the taxi, Defendant replied that he had used his cell phone. When confronted with the inconsistency about his cell phone not working, Defendant changed his story about the cell phone. He claimed he had used a cell phone belonging to his cousin Billy and that he had left it at Billy's house when he was arrested. Detective Olson told Defendant that those cell phone records would be subpoenaed in addition to Defendant's cell phone records. Defendant once again changed his story and said that the woman called the taxi. Detective Olson replied, "You've been lying to me all night, so don't stop now."

[¶14.]    Defendant continued to insist that the random woman had called him for sex. Several times during the interview, Detective Olson confronted Defendant with the inconsistencies in his story. Approximately fifteen minutes after Defendant waived his *Miranda* rights and after catching Defendant in several inconsistencies, Detective Olson stated the police would "match evidence up with the rape kit," and it would "show you guys had sex." Detective Olson then stated it

was "possible you're going to get arrested." Defendant asked "For how long?" Detective Olson replied: "It's possible you could end up going to jail for life for something like this."

[¶15.] After admitting to having had sex with the random woman, Defendant was asked if anyone else was in the woman's home during that time. He replied she had a baby with her in the home. When asked whether he had held E.C. down while having sex with her and if she had bruises on her wrists, Defendant stated the woman who had randomly called him did not have bruises on her wrists. He then claimed the woman showed him bruises on her wrists and stomach and told him her boyfriend had caused them.

[¶16.] Detective Olson took a break from the interview and left Defendant in the interrogation room. Defendant removed the same cell phone he had showed Detective Olson from his right pants pocket, made a call, and left a voice message. Defendant then removed a second cell phone from his left pants pocket and deleted numbers off of it. Detective Olson returned to the interrogation room and confronted Defendant, who admitted removing numbers from the cell phone. When asked about the extra cell phone, Defendant stated it belonged to his cousin "Chivo." Detective Olson took both cell phones away from Defendant and left the room after Defendant requested a glass of water.

[¶17.] After an officer brought Defendant a glass of water, Defendant requested to use the restroom. Defendant was warned not to wash his hands in order to allow recovery of any physical evidence under the search warrant. After returning to the interrogation room, Defendant was observed on video spitting onto

his hands, rubbing his hands together, and then rubbing the crotch of his pants and pants legs. He then poured water from a drinking glass onto his hands and attempted to wash them off. An officer returned to the room and told him to stop. After the officer left the room, Defendant returned to wiping his hands and crotch area. The officer returned and warned Defendant that if he continued "dinking around" with his hands, the officer would handcuff Defendant. The officer left. Defendant stopped wiping his hands and crotch area and fell asleep in the interview room. The interview ended with Defendant falling asleep. At no time during the course of the interview did the Defendant specifically admit having sex with E.C. or confess to the crime of rape.

[¶18.] Defendant was subsequently determined to be a thirty-three-year-old illegal alien from Guatemala. He attended six years of formal education while a child in Guatemala. Defendant was fluent in both Spanish and his first language Quiche, a Guatemalan dialect. Defendant had lived and worked in the United States for approximately twelve years at the time of his arrest. Sometime prior to the arrest, he had been arrested and deported as an illegal alien, but returned illegally to the United States a second time approximately seven months later. At the time of his arrest, he was employed in Worthington, Minnesota, at a meat packing plant using false documents.

[¶19.] Defendant was charged with one count of rape in the second degree. He entered a not guilty plea, and trial was scheduled. Defendant filed a motion to suppress his statements to police during the custodial interrogation. Defendant claimed that his statements were not voluntary and that he did not knowingly or

intelligently waive his rights because he was unable to understand the meaning of the word "waiver." The motion to suppress was denied.

[¶20.] Prior to trial, Defendant also sought exclusion of a recording of the 911 call made by E.C., the videotape of Defendant's interrogation, and the testimony of the emergency room physician who treated E.C. Defendant's motions in limine were denied. Defendant's offer of proof during trial of testimony by E.C.'s estranged mother, that E.C. was overly dramatic and had made a prior rape accusation, was also denied.

[¶21.] At the conclusion of trial, the jury found Defendant guilty of rape in the second degree. Defendant was sentenced to twenty years in the South Dakota State Penitentiary. Defendant appeals. He raises the following issues:

1. Whether the trial court erred in denying Defendant's motion to suppress.

2. Whether the trial court erred when it denied Defendant's motion to exclude the 911 call, the interrogation video, and the treating emergency room physician's testimony, as well as denied Defendant's offer of proof.

## ANALYSIS AND DECISION

[¶22.] **1. Whether the trial court erred in denying Defendant's motion to suppress.**

[¶23.] Defendant argues on appeal that he did not know what his *Miranda* rights were because he did not speak English well enough to understand the advisement, was tired from his work schedule, and was sleep deprived at the time of the interrogation. Without specifically identifying which of the four *Miranda* rights he did not understand, Defendant argues the words used by Detective Olson were beyond his language comprehension and educational levels. Defendant further

argues that the slight head nod visible on the videotape of the interrogation was equivocal and did not clearly indicate Defendant understood the advisement given by Detective Olson. Defendant also argues he did not voluntarily relinquish his Fifth Amendment rights because he did not speak English well enough to understand the word "waiver." The State argues based on Defendant's background, experience, and conduct after being advised of his rights and asked if he wished to waive those rights and speak with Detective Olson, a voluntary, knowing, and intelligent relinquishment occurred.

[¶24.] "This Court reviews the denial of a motion to suppress alleging a violation of a constitutionally protected right as a question of law by applying the de novo standard." State v. Ludemann, 2010 SD 9, ¶14, 778 NW2d 618, 622 (quoting State v. Madsen, 2009 SD 5, ¶11, 760 NW2d 370, 374). We review the voluntariness of a custodial admission and the validity of a defendant's *Miranda* waiver-of-rights separately, but as parallel inquiries. State v. Stanga, 2000 SD 129, ¶8, 617 NW2d 486, 488 (citing 2 S. Childress & M. Davis, Federal Standards of Review § 11.13, at 11-54, 55 (3d ed. 1999)). The State has the burden to prove by a preponderance of the evidence that a defendant's admissions were voluntary. State v. Tuttle, 2002 SD 94, ¶21, 650 NW2d 20, 30 (citing Nix v. Williams, 467 US 431, 444 n5, 104 SCt 2501, 2509 n5, 81 LEd2d 377, 387-88 n5 (1984); United States v. Matlock, 415 US 164, 178 n14, 94 SCt 988, 996 n14, 39 LEd2d 242, 253 n14 (1974)). On review, we consider the totality of the circumstances surrounding the interrogation as factual determinations, *id.* ¶20 (citing Miller v. Fenton, 474 US 104, 116, 106 SCt 445, 452-53, 88 LEd2d 405 (1985)), giving deference to the trial

court's findings of fact, State v. Cottier, 2008 SD 79, ¶19, 755 NW2d 120, 128 (citing State v. Johnson, 2007 SD 86, ¶29, 739 NW2d 1, 11). However, the issue of whether the interrogation was ultimately voluntary is a legal question. Tuttle, 2002 SD 94, ¶20, 650 NW2d at 30.

[¶25.]    A valid waiver requires a "knowing and intelligent relinquishment or abandonment of a known right or privilege." Edwards v. Arizona, 451 US 477, 482-83, 101 SCt 1880, 1884, 68 LEd2d 378 (1981) (quoting Johnson v. Zerbst, 304 US 458, 464, 58 SCt 1019, 1023, 82 LEd 1461 (1938)). "To establish that a defendant validly waived his Miranda rights 'the State must show by a preponderance of the evidence that (1) the relinquishment of the defendant's rights was voluntary and (2) the defendant was fully aware that those rights were being waived and of the consequences of waiving them.'" Cottier, 2008 SD 79, ¶18, 755 NW2d at 128 (quoting Tuttle, 2002 SD 94, ¶9, 650 NW2d at 26). The determination is based "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Edwards, 451 US at 481, 101 SCt at 1884, 68 LEd2d 378 (quoting Johnson, 304 US at 464, 58 SCt at 1023, 82 LEd 1461). "For a waiver determination, a court should consider a defendant's age, experience, intelligence, and background, including familiarity with the criminal justice system, as well as physical and mental condition." Tuttle, 2002 SD 94, ¶7, 650 NW2d at 25-26 (citing Fare v. Michael C., 442 US 707, 724-25, 99 SCt 2560, 2571-72, 61 LEd2d 197 (1979)). As the United States Supreme Court recently held:

> In determining whether police officers adequately conveyed the four warnings, we have said, reviewing courts are not required to examine the words employed "as if construing a will or defining the terms of an easement. The inquiry is simply

whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.' "

Florida v. Powell, ___ US___, ___, 130 SCt 1195, 1204, ___ LEd2d ___ (2010) (quoting Duckworth v. Eagan, 492 US 195, 203, 109 SCt 2875, 2880, 106 LEd2d 166 (1989)).

[¶26.] In the instant case, there is nothing on the videotape to suggest Defendant did not understand English sufficiently to comprehend the *Miranda* rights advisement given to him by Detective Olson. Furthermore, Defendant does not specify which of the four *Miranda* advisements he did not understand.[2] Defendant's argument that many of the legal terms in the *Miranda* warnings such as "waive," "exercise," "appointed," and "counsel," require the equivalent of a tenth or even twelfth grade education is misplaced given that Detective Olson did not use any of these words when giving Defendant his *Miranda* warnings. Instead, Detective Olson used the following statements:

> Just to let you know, before you can talk to me, need to let you know about your *Miranda* rights. I do want to talk to you and get your side of the story. You have the right to remain silent. You can stop questioning at any time. Anything you say can be used against you. You have the right to consult with an

---

2. The four Miranda advisements that must be communicated to a suspect prior to any custodial interrogation are:

   > 1[.] that he has the right to remain silent, 2[.] that anything he says can be used against him in a court of law, 3[.] that he has the right to the presence of an attorney, and 4[.] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

   *Powell*, ___ US at ___, 130 SCt at 1203, ___ LEd2d ___ (quoting Miranda v. Arizona, 384 US 436, 479, 86 SCt 1602, 1630, 16 LEd2d 694 (1966)).

attorney. If you cannot afford an attorney, one will be provided to you.

[¶27.] Defendant was able to converse with Detective Olson in English, give his address, explain that he no longer lived at the address on his driver's license, and describe where he had been during the evening. He was also able to give street addresses to the taxi driver as well as to Detective Olson that morning. Defendant's slight head nod is barely discernable on the videotape as Defendant was facing Detective Olson, but he was in profile in relation to the video camera. Detective Olson testified at the suppression hearing that he observed a small head nod from Defendant when he asked if Defendant understood his rights.

[¶28.] As demonstrated on the videotape, the words utilized by Detective Olson were also similar to the Defendant's own vocabulary. Defendant had a basic command of the English language that enabled him to explain past events, give names of bars and dance halls along with their street addresses and locations, and give a detailed history of when and where he lived in the past. Defendant was also able to explain that his cell phone was not working because he had not paid the bill and that he had borrowed several cell phones from friends or relatives that evening. Defendant's ability to answer appropriately questions posed to him indicated he had a significant ability to understand and speak English.

[¶29.] Defendant showed sufficient intelligence to offer up alternative versions of the events in order to avoid admitting that he knew E.C. and had been at E.C.'s home, as well as to provide another explanation for why he would be found to have engaged in sex shortly before his arrest. The few times Defendant showed

slight confusion appeared to be in an attempt to avoid answering questions or when caught in a lie by Detective Olson.

[¶30.] Based on the totality of the circumstances, including Defendant's basic command of the English language and his intelligence level, we agree with the trial court's determination that Defendant was able to understand the *Miranda* warnings. We can find no error in the trial court's determination that Defendant understood he could remain silent, he could stop the interrogation at any time, anything he said could be used against him, and that he had the right to speak with an attorney, or a court appointed one if he was unable to afford one on his own.

[¶31.] Defendant argues he did not voluntarily relinquish his Fifth Amendment rights because he did not speak English well enough to understand the word "waiver." Defendant further argues his response of "yeah" was meaningless conversation filler rather than a verbal acknowledgement in response to Detective Olson's request for a waiver. Defendant also argues that Detective Olson's failure to ask the question without the use of the word "waiver," a word Defendant claims he did not understand, was reversible error. The State argues that under the totality of the circumstances, including Detective Olson's action of raising his hand to stop Defendant from speaking coupled with his question as to whether Defendant would waive his rights and speak with him, there was a sufficient waiver request. It further argues that Defendant's words and conduct showed he waived his rights voluntarily, knowingly, and intelligently when he agreed to speak with Detective Olson.

[¶32.] An express verbal or written waiver from a defendant is not required to satisfy the constitutional requirements of a knowing, intelligent, and voluntary waiver. *Tuttle*, 2002 SD 94, ¶9, 650 NW2d at 26 (citing Miranda v. Arizona, 384 US 436, 475, 86 SCt 1602, 1628, 16 LEd2d 694 (1966)). If a defendant gives an ambiguous or equivocal response to a request for a waiver of *Miranda* rights, further questioning is permissible. Berghuis v. Thompkins, No. 08-1470, 2010 WL 2160784, at *13 (holding that "after giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights."). A valid *Miranda* waiver can be inferred when the defendant understands the rights and engages in "a course of conduct reflecting a desire to give up those rights." *Tuttle*, 2002 SD 94, ¶16, 650 NW2d at 29 (quoting North Carolina v. Butler, 441 US 369, 373, 99 SCt 1755, 1757, 60 LEd 286 (1979)). After ascertaining that a defendant knows and understands his *Miranda* rights, an officer may use a compound question such as "do you wish to waive these rights and do you want to talk to me at this time?" that encapsulates the concept that waiving the right to remain silent may be accomplished by agreeing to answer questions. *Id.* ¶18, 650 NW2d at 29. An affirmative response to the compound question can then constitute a voluntary and knowing waiver. *Id.*

[¶33.] As discussed above, we agree with the trial court that Defendant had sufficient knowledge and intelligence to understand his rights and the implications of waiving those rights, thus satisfying the knowing and intelligent element of a waiver. As to whether Defendant gave a positive response to Detective Olson indicating a knowing, intelligent, and voluntary waiver, we also agree with the trial

court. Detective Olson made it clear he was telling Defendant that he could only speak with Detective Olson if Defendant was "willing to waive [his] rights and talk to [Detective Olson]." Detective Olson asked the compound question three times. Each time Detective Olson asked the question, Defendant attempted to tell Detective Olson something about the events of the evening and Detective Olson stopped Defendant by raising his hand and asking the question once again. Detective Olson was not badgering Defendant as suggested by Defendant. Instead, Detective Olson was properly seeking to clarify Defendant's response of "I don't know," an equivocal response to the question. Defendant argues his statement indicated that he did not understand the question, rather than indicating the Defendant did not know whether he wished to relinquish his rights. However, the tape indicates Defendant did not appear confused, ask for clarification, or complain that he did not understand the question. Instead, he maintained he did not know why he was at the police station.

[¶34.] On the fourth try, Detective Olson asked Defendant if he was willing to talk with him, and Defendant answered "yeah." While not phrased in the compound as it was the three times prior, it is apparent from the context and the timing that this was the same question posed to Defendant three times before the final request. Defendant's answer to the question was an affirmative and unequivocal positive response to the question repeatedly posed by Detective Olson. A simple "yeah" in agreement as stated by Defendant was enough to express a waiver verbally. *See Tuttle*, 2002 SD 94, ¶10, 650 NW2d at 27. Furthermore, Defendant's willingness to answer questions about the potential charges against

him showed a course of conduct reflecting a desire to give up his *Miranda* rights in order to gain more information and provide exculpatory information in order to secure a quick release.

[¶35.]    The relevant question is not whether Defendant understood the meaning of the word "waiver." The question is whether Defendant understood that by agreeing to speak with Detective Olson, Defendant would be giving up his *Miranda* rights. We find no error in the trial court's conclusion of law that Defendant's waiver was intelligent, knowing, and voluntary.

[¶36.]    **2.    Whether the trial court erred when it denied Defendant's motion to exclude the 911 call, the interrogation video, and the treating emergency room physician's testimony, as well as denied Defendant's offer of proof.**

[¶37.]    Defendant argues the trial court made erroneous evidentiary rulings when it admitted the audio tape of the 911 call, the interrogation video, and the emergency room treating physician's testimony. He also claims error when the trial court refused his offer of proof of comments made by E.C.'s mother to police on the morning of the assault. Defendant argues that those comments, that E.C. was overly dramatic and had made a rape accusation in the past, were necessary to show the police were aware that a more thorough investigation of E.C.'s allegation was required. Defendant claims the errors are of such a magnitude that he was denied his right to a fair trial.

[¶38.]    For the standard of review, Defendant cites to a Nebraska Supreme Court case that holds "[i]n a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the

error was harmless beyond a reasonable doubt." State v. Jackson, 258 Neb 24, 601 NW2d 741, 749-50 (1999) (citing State v. Harrold, 256 Neb 829, 593 NW2d 299 (1999); State v. Chojolan, 253 Neb 591, 571 NW2d 621 (1997)). However, our standard of review is different from that employed by the Nebraska Supreme Court. "We presume the evidentiary rulings made by a trial court are correct, and review those rulings under an abuse of discretion standard." State v. Fool Bull, 2008 SD 11, ¶10, 745 NW2d 380, 385 (quoting State v. Mattson, 2005 SD 71, ¶13, 698 NW2d 538, 544). "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." State v. Shaw, 2005 SD 105, ¶18, 705 NW2d 620, 625 (quoting State v. Henry, 1996 SD 108, ¶10, 554 NW2d 472, 473 (quoting State v. Moriarity, 501 NW2d 352, 355 (SD 1993); State v. Devall, 489 NW2d 371, 374 (SD 1992)). *See* State v. Williams, 2008 SD 29, ¶13, 749 NW2d 435, 440. Any evidentiary errors by the trial court must be prejudicial in nature to warrant reversal on appeal. *Fool Bull*, 2008 SD 11, ¶14, 745 NW2d at 385. Error is prejudicial when, in all probability, it produced some effect upon the final result and affected rights of the party assigning it. *Id.*

*Audio recording of the 911 Call*

[¶39.] At trial, over the objections of Defendant, the trial court admitted the audio recording of E.C.'s 911 call as an excited utterance under SDCL 19-16-6 (FRE 803(2)),[3] an exception to the hearsay rule. Defendant argues the admission of the

---

3. SDCL 19-16-6 (FRE 803(2)) provides: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition, is not excluded by § 19-16-4 [(FRE 802)], even though the declarant is available as a witness."

recording was within the constraints of SDCL 19-16-6 (FRE 803(2)), but was cumulative as E.C. had already testified to her highly emotional state and the fact that she believed Defendant had raped her. Defendant argues the cumulative evidence was more prejudicial than probative per the provisions of SDCL 19-12-3 (FRE 403), and was designed to evoke the jury's passion. Defendant argues the state's attorney's reference to the 911 audio tape during closing arguments by asking "Does that sound to you like a woman who has just engaged in consensual sex?" was an improper appeal to the jury's passion.

[¶40.] The State argues the evidence was not cumulative on the issues of identity and consent. Defendant claimed that he did not know E.C., and that he had consensual sex with a woman whose name he could not remember. The State sought to have the audio tape admitted in order to prove that the sex between E.C. and Defendant occurred and that it was not consensual.

[¶41.] SDCL 19-12-3 (FRE 403) provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." To be excluded under SDCL 19-12-3 (FRE 403), the evidence must be unfairly prejudicial and not just prejudicial to a defendant's case. State v. Holzer, 2000 SD 75, ¶27, 611 NW2d 647, 655. "Unfair prejudice means evidence that has the capacity to persuade by illegitimate means." *Id.* (citing State v. Brings Plenty, 459 NW2d 390, 399 (SD 1990)).

[¶42.] Defendant argued to the trial court that the 911 tape was overly emotional and sought to persuade the jury by illegitimate means by evoking emotion and passion in the jury. The trial court engaged in the required balancing test on the record and outside the presence of the jury and admitted the 911 recording. A review of the 911 call shows E.C. was crying and coughing as she reported "he forced me to have sex." She also conveyed that she had scratched Defendant in order to get him off of her, that he called a taxi, and that he left her apartment. E.C. was also able to give Defendant's name as "Antonio," and inform law enforcement that he was no longer in the apartment.

[¶43.] While emotional and upset during the call, E.C. was not hysterical or so overcome by emotion as to evoke passion sufficient to overcome reason and evidence. The tape was one piece of evidence, in addition to E.C.'s live testimony that the sex was not consensual. We can find no error, much less prejudicial error in the trial court's evidentiary ruling on the 911 tape.

*Videotape of Defendant's interrogation*

[¶44.] Defendant next argues the interrogation videotape should have been excluded because in it Detective Olson repeatedly states that Defendant was lying. Defendant claims this resulted in Detective Olson testifying as to Defendant's credibility and violating the province of the jury. *See* State v. Raymond, 540 NW2d 407, 409-10 (SD 1995). The State argues the trial court's two limiting instructions to the jury, that it was the exclusive judge of the credibility of witnesses and not to consider Detective Olson's statements when determining Defendant's credibility, were sufficient.

[¶45.] The jury was instructed as follows: Jury Instruction No. 5 stated in relevant part: "Furthermore, a particular item of evidence is sometimes received for a limited purpose. I shall tell you when that occurs, and instruct you on the purposes for which the item can and cannot be used." Jury Instruction No. 22 stated in relevant part: "You are the exclusive judges as to whether an admission was made by the defendant and if the statement is true in whole or in part. . . . It is for you to determine what weight, if any, to give to a purported admission." Finally, Jury Instruction No. 24 stated: "You have viewed a video of an interrogation of the defendant. Questions and statements by police are not evidence. Statements made by the defendant are evidence."

[¶46.] Defendant cites to *State v. Elnicki*, 105 P3d 1222 (Kan 2005), in support of his argument that the videotape should have been excluded. However, in that case no limiting instruction was provided to the jury with regard to the officer's accusations during the interrogation that Elnicki was lying. *Id*. at 1229. Furthermore, the Kansas Supreme Court did not ultimately render a decision as to whether the admission of the officer's videotaped accusations was reversible error. *Id*. at 1236. Instead, the effects of several cumulative errors required reversal. *Id*. In the instant case, the trial court instructed the jury multiple times that Detective Olson's statements on the videotape were not evidence to be considered by the jury.

[¶47.] We presume the jury follows the trial court's limiting instructions. State v. Honomichl, 410 NW2d 544, 547 (SD 1987) (citing State v. Maves, 358 NW2d 805 (SD 1984); State v. No Heart, 353 NW2d 43 (SD 1984)). Given the jury instructions provided, the jury was capable of determining Defendant's credibility

-21-

for itself without reliance on Detective Olson's statements to that effect on the videotape.[4]

*Testimony of the treating emergency room physician*

[¶48.]    Defendant next argues that the emergency room treating physician's testimony in response to the question by the state's attorney whether E.C. appeared "to be consistent with other individuals who come in and are alleging that they have been sexually violated?" was irrelevant and therefore inadmissible due to the form of the question.  The State argues the testimony was admissible under SDCL 19-15-2 (FRE 702), was limited to the victim's injuries, and did not give an opinion as to Defendant's guilt.

[¶49.]    SDCL 19-15-2 (FRE 702) provides:  "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  We have previously held that "a medical doctor's testimony that does not give an opinion as to defendant's guilt and only states that the victim's injuries did not indicate consent, does not invade the province of the jury."  State v. Moran, 2003 SD 14, ¶44, 657 NW2d 319, 330 (citing State v. Running Bird, 2002 SD 86, ¶40, 649 NW2d 609, 617).

---

4.    As an alternative, the entire issue could have been avoided if the videotape had been redacted to eliminate Detective Olson's statements that Defendant was lying.  However, at oral argument, Defendant asserted that the context of the interview would have been lost with redaction.  Thus no motion for redaction was made.  Had there been one, whether to redact and to what extent was within the sound discretion of the trial court.

[¶50.]     Defendant cites to *Brown v. Commonwealth*, 812 SW2d 502, 503-4 (Ky 1991), for the position that "consistent with abuse" is looked upon with disfavor by the Kentucky Supreme Court.  However, in that case the issue was whether a child sex abuse victim's behavior "was consistent with" Child Sexual Abuse Accommodation Syndrome.  *Id.*  That court ruled that because the syndrome was not a "generally accepted medical concept," the testimony was not admissible.  *Id.* at 504.  It did not hold that the phrase "consistent with abuse" was reversible error.  *Id.*

[¶51.]     Dr. Driver was testifying to the specific physical findings on E.C.'s body at the time the question was posed.  The entire question was as follows:

> Your examination of her and what you testified to as to – her indication that her pelvic area was burning, that she had this slight area of erythema in the 6:00 region, the fact that she had this swab of discharge, that was consistent with the appearance of semen, did she appear to you to be consistent with other individuals who come in and are alleging that they have been sexually violated?

Dr. Driver's response was a simple "yes."  We can find no error in the trial court's ruling on this testimony.

### *Denial of Defendant's offer of proof*

[¶52.]     Defendant's final issue is that the trial court erred when it refused his offer of proof as to statements made by E.C.'s mother.  After E.C. was taken to the emergency room, E.C.'s mother was called to care for E.C.'s one-year-old daughter.  While at the apartment, E.C.'s mother asked something to the effect of whether E.C. was accusing someone of rape again and then stated that E.C. had always been overly dramatic.  Defendant argues the statements went to the thoroughness of the

police investigation in that the mother's comments should have alerted the police that it was possible that E.C. had fabricated the rape story. Defendant argues this "impeachment" testimony should have been allowed and failure to do so violated his right to due process.

[¶53.] The State argues that Defendant sought a ruling on the offer of proof but did not provide the trial court with the substance of the witness's testimony other than the general statements that E.C. was overly dramatic and had reported she had been raped in the past.[5] The State notes that the trial court read E.C.'s Department of Social Services file. It then determined E.C. and her mother were estranged when parental rights were terminated when E.C. was fourteen, and that little to no contact between the two had occurred in the ensuing seven years. The trial court concluded E.C.'s mother lacked first hand knowledge of a rape allegation E.C. made to a counselor sometime around the age of fifteen while she was in foster care. By the time E.C. reported the allegation, the mother's parental rights had been terminated and the two were estranged. Some limited contact between E.C. and her mother was re-established shortly after the birth of E.C.'s daughter, who was approximately one-year-old at the time of the rape, but it was limited to giving E.C.'s mother some visitation with E.C.'s daughter a few of hours a month, some holiday visitation, and some telephone contact.

---

5.  We note that in some previous cases before this Court, the trial court has required the witness to testify as part of the offer of proof to ascertain the exact nature of the testimony the party making the offer wishes to present. In other cases, the trial court has accepted an attorney's representation as to the nature of that testimony. Such a determination is best left to the discretion of the trial court.

[¶54.]     According to Defendant, the final offer of proof made to the trial court was two-fold. First, to allow E.C.'s mother to testify that E.C. had always been overly dramatic and had a need for attention. Second, Defendant offered the mother's statements to police the night of the rape as an indication that the police should be careful and more thoroughly investigate E.C.'s rape allegation. It is unclear from the record what the exact content of these statements would have been given Defendant's concession that he could not ask about the prior rape allegation. Defendant proposed questioning Officer Warwick as to whether the mother said anything that indicated further investigation was necessary. In the alternative, Defendant proposed a leading question to the mother as to whether she said anything to the investigating officers that should have tipped them off that they needed to investigate the rape allegation more thoroughly. Defendant argued he wanted to offer the testimony in order to establish that there was a need for a more thorough investigation. However, Defendant had already attempted to show during the live testimony of the responding officers during the State's case-in-chief that the police had failed to conduct a thorough investigation of E.C.'s allegations before focusing the investigation on Defendant.

[¶55.]     After Defendant's first offer, the trial court determined that under SDCL 19-9-3 (FRE 103(a)), the substance of the evidence was not made known to it by Defendant.[6] The vague description of the testimony E.C.'s mother would have

---

6.     SDCL 19-9-3 (FRE 103(a)) provides in relevant part:

(continued . . .)

purportedly given did not provide the trial court with the foundation for the testimony or its substance. The trial court also determined that the testimony about E.C.'s supposed overly dramatic personality was inadmissible under SDCL 19-12-4 (FRE 404(a))[7] as it was evidence of a character trait that was being offered to show E.C. behaved in conformity with that trait on the night of the rape. The trial court further found the testimony about a prior rape allegation was inadmissible under the rape shield law and that the mother telling officers E.C. had cried rape before was not the same as telling law enforcement to investigate the case more thoroughly.

[¶56.] Defendant renewed his offer of proof the following day after providing the trial court with additional information about the amount of contact between E.C. and her mother in order to establish the foundation for the purported

---

(. . . continued)

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:
>
> . . .
>
> 2) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

7.  SDCL 19-12-4 (FRE 404(a))provides in relevant part:

> Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
> . . .
>
> (2) Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same[.]

statements. The trial court once again refused the offer after determining that the mother lacked firsthand knowledge of the prior rape, and that there was no foundation for the mother's testimony.

[¶57.]     Defendant argues the trial court erred when it refused the offer of proof regarding E.C.'s overly dramatic personality trait because the testimony was not being offered to show conformity on the night of the rape. He also argues the offer of proof regarding the mother's concerns that the investigation should have been more thorough should have been allowed, but without reference to the prior rape allegation. Both, Defendant argues, were critical to showing that the police failed to conduct a thorough investigation despite being given good reasons to do so by E.C.'s mother.

[¶58.]     Defendant had the opportunity to cross-examine the investigating officers as to the thoroughness of their investigation on the morning of the rape. We fail to see how the mother's testimony concerning E.C.'s supposed personality trait was relevant to whether the police conducted a thorough investigation. We agree with the trial court that the mother's testimony regarding her opinion of E.C.'s overly dramatic personality was not admissible under SDCL 19-12-4 (FRE 404(a)).

[¶59.]     With regard to the prior rape allegation, SDCL 23A-22-15 (repealed 2010) precludes evidence of specific instances of the victim's prior sexual conduct except when "the court shall first conduct a hearing in the absence of the jury and the public to consider and rule upon the relevancy and materiality of the evidence." The rule pertains to "prior sexual conduct," which pre-supposes that it occurred. However, here by implication, the Defendant was attempting to bring to the jury's

attention facts which would point to a conclusion that in the past, E.C. had made false accusations of rape against others. In *State v. Sieler*, 397 NW2d 89 (SD 1986), the defendant charged with sexual contact sought to cross-examine the complainant about false claims of rape she allegedly made in the past. *Id.* at 91. The trial court refused concluding such testimony was irrelevant. *Id.* We held that to become relevant the prior charge of rape must be shown to be "demonstrably false" as prior truthful charges of rape are not relevant.[8] *Id.* at 92. To do otherwise would turn "the trial into one of the victim." *Id.*; *see also* State v. Guthmiller, 2003 SD 83, ¶28, 667 NW2d 295, 305; State v. Dillon, 2001 SD 97, ¶26, 632 NW2d 37, 47. Here, no such showing of demonstrable falsity was made. The trial court's decision was, therefore, justified under *Sieler*, 397 NW2d 89.

[¶60.]    In summary, there was no foundation for the mother's testimony given the status of her relationship with E.C. at the time E.C. allegedly made the statements about a prior rape to a counselor. Therefore, the relevance of a prior rape allegation was not established with regard to the thoroughness of the police investigation on the morning of the rape. For the above reasons, the trial court did not abuse its discretion.

[¶61.]    Affirmed.

[¶62.]    KONENKAMP, ZINTER, MEIERHENRY, and SEVERSON, Justices, concur.

---

8.    In *Sieler,* 397 NW2d 89, we did not examine the limited scope of admissibility of actual past sexual conduct under SDCL 23A-22-15 as the issue was not raised on appeal.